**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 23, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RICHARD FAIRCHILD,

      Petitioner - Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary, E. SCOTT
PRUITT, Attorney General of the State of
Oklahoma,

      Respondents - Appellees.

No. 13-6030

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:01-CV-01550-D)**

Randy A. Bauman, Assistant Federal Public Defender (Thomas Kenneth Lee, Assistant
Federal Public Defender, with him on the brief), Oklahoma City, Oklahoma, for
Petitioner - Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (E. Scott Pruitt,
Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Respondent - Appellee, Anita Trammell.

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

**HARTZ**, Circuit Judge.

An Oklahoma jury found Defendant Richard Fairchild guilty of child-abuse murder in the first degree and recommended the death penalty, which the trial court imposed. The Oklahoma Court of Criminal Appeals (OCCA) denied relief on all claims presented on direct appeal and in Defendant's original application for postconviction review. After the United States District Court for the Western District of Oklahoma denied relief on all claims presented in his application for relief under 28 U.S.C. § 2254, Defendant appealed to this court. In that appeal we addressed his claim that his counsel had been ineffective in failing to investigate and present mitigation evidence at the sentencing stage of his trial. We vacated the district court's judgment and remanded to give Defendant the opportunity to exhaust in state court the "far more specific and powerful" ineffective-assistance claim he had raised in his § 2254 application but had not previously presented to the OCCA. *Fairchild v. Workman*, 579 F.3d 1134, 1147 (10th Cir. 2009). After the OCCA denied Defendant's second application for state postconviction relief on procedural grounds, the federal district court determined that the OCCA's procedural bars were valid and that Defendant had not overcome them by demonstrating cause and prejudice or a fundamental miscarriage of justice. Defendant now returns to this court, seeking relief on his § 2254 claims or, at least, an evidentiary hearing on his ineffective-assistance claim. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

## I.      BACKGROUND

### A.      The Crime of Conviction and Sentence

Defendant was charged in November 1993 with child-abuse murder in the first degree for the death of Adam Broomhall, his girlfriend's three-year-old son.  In his prior appeal to this court, we summarized the OCCA's description of the facts of the crime as follows:

> In November 1993, [Defendant] was living with Stacy Broomhall and her three children in Midwest City, Oklahoma.  On November 13, 1993, [Defendant] and Ms. Broomhall drank beer most of the afternoon and evening.  [Defendant] consumed approximately twelve beers between 2:00 p.m. and 9:00 p.m.  That evening, they drove to Ms. Broomhall's mother's house in north Oklahoma City and continued to drink.  By the time they were ready to leave, [Defendant] and Ms. Broomhall were too intoxicated to drive, so Ms. Broomhall's seventeen-year-old sister, Charity Wade[,] drove them home.  Ms. Wade had intended to spend the night at Ms. Broomhall's house.  But she decided not to do so after [Defendant] made a sexual advance toward her.  Instead, Ms. Wade put Ms. Broomhall's three children to bed and called a taxi to take her home. While Ms. Wade waited outside for the cab, [Defendant] retrieved a baseball bat and told her that, "if someone other than a cab driver came to pick her up, he was going to beat him to death."  When Ms. Wade left in the cab, some time before 10:30 p.m., Ms. Broomhall's three-year-old son Adam was asleep in his own bed.
>
> Roughly three hours later, Adam woke up crying and got out of bed. His mother was asleep, and [Defendant] told Adam to "hush it up."  When Adam persisted, [Defendant] hit him several times, rupturing the inside of his upper lip and his left ear-drum, and he held Adam's chest and then buttocks against a hot wall heater causing severe second-degree grid-patterned burns.  [Defendant] told a detective several days later, "I think I pushed him up against the heater and held him up there," and, "The more he screamed, the more I just kept on hitting him."  When [Defendant] threw Adam against the drop-leaf dining table, he stopped breathing.

3

[Defendant] woke Ms. Broomhall and called 911. Adam was rushed to the hospital, but the head injury had caused severe hemorrhaging and swelling, and he died later that morning, never having regained consciousness. Examination indicated that Adam had sustained approximately twenty-six blows to his body, including several to his head. In a written statement to the police, [Defendant] claimed that Adam was running in the house and "ran right into the table."

*Fairchild*, 579 F.3d at 1137–38 (citations omitted).

## B. The Trial

Although Defendant argued (unsuccessfully) that he should be permitted to present defenses based on his intoxication at the time of the crime, trial counsel indicated outside the jury's presence that he and Defendant agreed that nothing could be done to avoid a guilty verdict and that his client-approved strategy was to save Defendant's life. At the sentencing phase, defense counsel presented mitigation testimony by Defendant and three others—his ex-wife's daughter, who spoke of him as her "daddy," R., Vol. III (Tr. of Jury Trial Proceedings (Tr.), Vol. VI at 1305, *State v. Fairchild*, No. CF-93-7103 (Okla. Cnty., Okla. Dist. Ct. Jan. 18, 1996)); his older half-brother, who spoke of Defendant's ill treatment as a child, the family history of alcoholism, and Defendant's own alcoholism; and a psychiatrist, Dr. John Smith, who conducted a psychiatric interview of Defendant shortly before he testified, about two years after Adam's death.

The mitigation evidence focused primarily on Defendant's history of alcoholism and "explosiveness" when drunk. Tr., Vol. V at 1226. We describe the evidence in some detail because it was the principal disputed issue at trial and the source of Defendant's most troublesome issue in this court—his claim of ineffective assistance of counsel

4

arising from counsel's failure to investigate and present evidence of organic brain damage.

Dr. Smith testified that Defendant's difficulties began with unresolved grief over the death of his mother, who was killed by an alcoholic in a car accident when Defendant was 15; and he diagnosed Defendant as having dysthymia (persistent mild depression) arising from that event. *See id.* at 1224. He also diagnosed Defendant with acute brain syndrome secondary to alcohol addiction. *See id.* at 1226–27. He expressed his opinion that Defendant would not have killed Adam "had he not been chronically affected by and acutely affected by the ingestion of alcohol," *id.* at 1226, and that he did not intend to kill the child, *see id.* at 1228. He explained that Defendant's "brain was clearly damaged from intoxication." *Id.* at 1234. When, however, he was asked by the prosecutor whether Defendant had any brain trauma, he did not answer directly but referenced a history of unconsciousness[1] from fighting. *See id.* at 1245. The prosecutor then elicited that Dr. Smith had seen no evidence of seizure disorders, *see id.*, and followed up by asking: "[S]ince he doesn't have any brain trauma which you can conf[i]rm and no seizure disorder that you can confirm, basically you're relying upon his history of using alcohol and what he tells you happened in his past life?" *Id.* at 1246. Dr. Smith replied, "Yes. And the other things I've mentioned." *Id.* When asked whether he had diagnosed Defendant as having acute brain syndrome, Dr. Smith explained that, technically, the

---

[1] The transcript says "consciousness," Tr., Vol. V at 1245, but the context indicates that Dr. Smith meant "unconsciousness."

diagnosis of acute brain syndrome secondary to alcohol ingestion would apply to anyone who is drunk, but that, in contrast to a single episode of acute drunkenness, the chronic, continuous use of alcohol "causes a wide degree of damage to the brain . . . only part of which may go away when you stop using alcohol." *Id.*, Vol. VI at 1257. He said that he had not asked Defendant whether he had fought or had an explosive temper when sober because he assumed, in light of his history of continuous alcohol use, that Defendant "always had some chronic evidence, if not acute evidence of chronic brain disorder," and that "his brain is never clear." *Id.* at 1258–59.

Dr. Smith also testified on cross-examination that he had not seen the medical examiner's report on Adam, but that "[i]t was the worst case I've ever heard described . . . [a]nd I've seen some hideous things." *Id.* at 1260. Asked whether he was saying that Defendant did not know when drunk "that it's inappropriate to hit a three-year-old child in the head," Dr. Smith replied:

> What I am telling you is that there was such an outburst of rage that was the lack of control is related to the alcohol and that in this outburst of rage he truly had [] no control over what was happening. And that this outburst of rage went on and for whatever period of time and that the core of why he did not have control was because of this alcohol pois[]oned brain.

*Id.* at 1261. Dr. Smith believed that Defendant was aware of "the child's screaming and crying which is almost always what brings on these kinds of explosive outburst[s]," and was aware that he was holding Adam against the wall heater, but that he had "some kind of crazy idea in his head which again indicates how little control and sense he had at that point [in] time, that somehow that would make this child stop crying." *Id.* at 1263. In

6

Dr. Smith's opinion, Defendant had awareness but "no real control over or sense over what he's doing." *Id.* "[T]he whole thing just went on and on until he realized that Adam might be dead." *Id.* at 1267–68.

The jury found the aggravating circumstance that the murder was especially heinous, atrocious, or cruel and recommended the death penalty. *See Fairchild*, 579 F.3d at 1138. The trial court imposed the sentence on February 2, 1996. *See id.*

### C. Posttrial Proceedings

The OCCA affirmed Defendant's conviction and sentence in an opinion filed August 20, 1998, *see* Aplt. Br. attach. E, which was withdrawn after the OCCA granted Defendant's petition for rehearing, *see Fairchild v. State*, 992 P.2d 349 (Okla. Crim. App. 1999). The OCCA's superseding opinion, issued December 9, 1999, affirmed the conviction and sentence with different reasoning. *See Fairchild v. State*, 998 P.2d 611 (Okla. Crim. App. 1999), *on denial of reh'g* (May 11, 2000). The OCCA denied Defendant's second petition for rehearing, *see* Aplt. Br. attach. K, and the United States Supreme Court denied his petition for a writ of certiorari, *see Fairchild v. State*, 532 U.S. 1039 (2001).

On March 16, 1998, during the pendency of his direct appeal, Defendant filed an application for state postconviction review, raising several claims of ineffective assistance of trial and appellate counsel—including that counsel had been ineffective in failing to investigate mitigation evidence arising from Defendant's drug use, boxing activities, and head injuries—and requesting an evidentiary hearing and discovery. The

7

OCCA denied the application and the requests on October 25, 2000. *See* Aplt. Br. attach. G.

Defendant filed his § 2254 application on May 16, 2002. It alleged several grounds for relief and requested an evidentiary hearing. *See Fairchild*, 579 F.3d at 1144. One ground was that "trial and appellate counsel were ineffective for failing to discover, present, and preserve issues relating to [Defendant's] head trauma and resulting organic deficits." R., Vol. II (Pet. for Writ of Habeas Corpus, Doc. No. 15 (Habeas Appl.) at 69, *Fairchild v. Mullin*, No. CIV-01-1550-T (W.D. Okla. May 16, 2002)). In support he submitted (with the court's permission) three affidavits, including two from experts saying that he had organic brain damage. The district court denied relief on September 26, 2006, without holding an evidentiary hearing.

Defendant timely filed a notice of appeal, and the district court granted a certificate of appealability (COA) on five issues. *See Fairchild*, 579 F.3d at 1138–39. On appeal, however, we addressed only Defendant's claim that his counsel had been ineffective in failing to investigate and present mitigation evidence of organic brain damage at the sentencing phase of his trial. We held that although Defendant had exhausted a narrower claim of ineffective assistance, he had not exhausted this claim by presenting it to the OCCA, and we remanded to allow him to try to exhaust the claim. *See id.* at 1148–55. Defendant presented the claim to the OCCA in a second application for state postconviction relief, but the OCCA denied it on procedural grounds. R., Vol. I at 230. The federal district court determined that the OCCA's procedural bars were valid

and that Defendant had not overcome them by demonstrating cause and prejudice or a fundamental miscarriage of justice. Aplt. Br. attach. C at 7.

### D. The Present Appeal

Defendant timely filed a notice of appeal. We granted a COA on the following issues:

> [1] Whether Oklahoma's mens rea requirement for child-abuse murder violated [Defendant's] Fourteenth Amendment rights;
>
> [2] Whether Oklahoma's mens rea requirement for child-abuse murder violated [Defendant's] Eighth Amendment rights;
>
> [3] Whether [Defendant's] constitutional rights were violated by virtue of the fact that he did not receive lesser related or lesser included offense instructions;
>
> [4] Whether trial and appellate counsel were ineffective for failing to discover, present, and preserve issues relating to [Defendant's] head trauma and resulting injuries . . . ;
>
> [5] Whether [Defendant's] constitutional rights were violated by virtue of the failure of the jury instructions to adequately explain the possible sentence of life without the possibility of parole;
>
> [6] Whether there was cumulative error.

Order at 2, *Fairchild v. Trammell*, No. 13-6030 (10th Cir. Dec. 23, 2013). On the fourth issue we clarified that both ineffective-assistance claims—one exhausted and one unexhausted—were certified. *See id.*

## II. STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires that we apply a "highly deferential standard" in habeas proceedings under 28 U.S.C.

9

§ 2254, one that "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks omitted). When a state court has adjudicated a claim on the merits, a federal court cannot grant relief on that claim under § 2254 unless the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The Supreme Court has emphasized that "review under § 2254(d)(1) focuses on what a state court knew and did"; thus, "[s]tate-court decisions are measured against [Supreme Court] precedents as of the time the state court renders its decision." *Cullen*, 131 S. Ct. at 1399 (internal quotation marks omitted).

"[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of th[e] Court's decisions . . . ." *Williams v. Taylor (Terry Williams)*, 529 U.S. 362, 412 (2000). Federal courts may not "extract clearly established law from the general legal principles developed in factually distinct contexts," *House v. Hatch*, 527 F.3d 1010, 1017 n.5 (10th Cir. 2008), and Supreme Court holdings "must be construed narrowly and consist only of something akin to on-point holdings," *id.* at 1015; *see id.* at 1016–17.

A state-court decision is "contrary to" the Supreme Court's clearly established precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Terry Williams*, 529 U.S. at 405–06. It is not necessary that the state court cite, or even be aware of, applicable Supreme Court decisions, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

A state-court decision is an "unreasonable application" of Supreme Court precedent if the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Terry Williams*, 529 U.S. at 407–08. We assess "objective[] unreasonable[ness]," *id.* at 409, in light of the specificity of the rule: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Terry Williams*, 529 U.S. at 410. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. When the state court does not explain its decision, the applicant must still show that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("we owe deference to the state court's *result*, even if its reasoning is not expressly stated"). Under AEDPA, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision;

11

and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102.

Review of substantive rulings under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S. Ct. at 1398; *see Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012) (discussing § 2254 review of state-court merits decisions after *Cullen*). And a federal court must accept a fact found by the state court unless the defendant rebuts the finding "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Supreme Court has emphasized in the strongest terms the obstacles to relief, observing that § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (internal quotation marks omitted). To obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102. Thus, "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Id.* at 88.

Although federal-court deference to the state court's decision is appropriate only on claims "adjudicated on the merits," 28 U.S.C. § 2254(d), the defendant has the burden of showing that the claim was not so adjudicated. "When a federal claim has been

presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99; *accord*, *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013). "Where there is no indication suggesting that the state court did not reach the merits of a claim, we have held that a state court reaches a decision on the merits even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion." *Dodd v. Trammell*, 753 F.3d 971, 983 (10th Cir. 2013) (ellipsis and internal quotation marks omitted).

Federal courts do not defer under AEDPA when the state court did not determine the issue on its merits. If the claim is not procedurally barred, the district court then decides the issue in the first instance, and we review its conclusions of law de novo and its findings of fact for clear error. *See Thacker v. Workman*, 678 F.3d 820, 829–30 (10th Cir. 2012).

## III. CHALLENGES TO *MENS REA*

Three of Defendant's claims relate to the *mens rea* for child-abuse murder. At trial the court instructed the jury that an element of child-abuse murder was that the act be "willful or malicious." R., Vol. I at 55. It said that *willful* means "[p]urposeful" but "does not require any intent to violate the law, or to injure another, or to acquire any advantage." *Id.* It defined *malicious* as "import[ing] a wish to vex, annoy, or injure another person." *Id.* Defendant did not object at trial to the instructions defining *willful* and *malicious*. *See Fairchild*, 998 P.2d at 626. The court refused to give Defendant's

13

requested instructions on the defense of intoxication, *see* R., Vol. III Criminal Appeal

Original R., Vol. IV at 766–77, 769, 772–73 (*Fairchild*, No. CF-93-7103 (Okla. Cnty.,

Okla. Dist. Ct. Aug. 5, 1996)), and the lesser offense of second-degree murder (based on

an alleged lesser *mens rea* caused by intoxication), *see id.* at 768, 770–71.  Defendant

argues that (1) the OCCA changed the *mens rea* requirement for the crime and violated

his rights to due process and equal protection by improperly applying it retroactively to

his offense; (2) the Eighth Amendment prohibits imposition of the death penalty for a

crime with this "minimal" *mens rea* absent an additional jury finding of culpability,

which was not made; and (3) the OCCA improperly rejected his request for a lesser-

included-offense instruction based on voluntary intoxication.  We address these claims in

turn.

> ### A.      Due Process and Equal Protection

While Defendant's direct appeal was pending before the OCCA, that court issued

two opinions that, he argues, should have required reversal of his conviction because his

jury was incorrectly instructed on the *mens rea* requirement for child-abuse murder.  In

*Hockersmith v. State*, 926 P.2d 793, 795 (Okla. Crim. App. 1996), the OCCA held that

the trial court had committed plain error in its jury instructions on child-abuse murder by

stating that the term *willful* did not require an intent to injure another.  *Bannister v. State*,

930 P.2d 1176, 1178–79 (Okla. Crim. App. 1996), followed suit.  After the OCCA's first

opinion affirming his conviction, Defendant petitioned for rehearing on the ground

(among others) that the OCCA's failure to follow *Hockersmith* and *Bannister* would

14

violate the due-process prohibition against ex post facto laws. In an August 4, 1999 order the OCCA granted Defendant's rehearing petition and withdrew its opinion.

The OCCA's superseding opinion, issued December 7, 1999, affirmed the conviction and sentence with different reasoning. *See Fairchild*, 998 P.2d 611. The OCCA held that the trial court's instruction on *mens rea* correctly stated the law in effect before and after Defendant's trial and that in light of that *mens rea* requirement there was no voluntary-intoxication defense to the charge. *See Fairchild*, 998 P.2d at 619–23. Therefore, the trial court had properly rejected a lesser-included-offense instruction on second-degree murder due to voluntary intoxication. *See id.* at 627. The court said that any language in *Hockersmith*, *Bannister*, or other precedents "inconsistent with our holding herein is expressly overruled." *Id.* at 626. Defendant again petitioned for rehearing, contending, among other things, that the OCCA's ruling deprived him of due process and equal protection. The equal-protection argument was that Defendant, Hockersmith, and Bannister were similarly situated defendants but had not been treated the same. The OCCA denied the petition on May 11, 2000.

Defendant again argues here that the asserted change in the *mens rea* requirement denied him due process and equal protection. We review these claims under AEDPA's deferential standard of review.

We rejected the same due-process claim in *Evans v. Ray*, 390 F.3d 1247, 1252–54 (10th Cir. 2004). There we held that application of the OCCA's decision in *Fairchild*, 998 P.2d 611, to Evans (who committed his offense in November 1996, the month after

15

the *Hockersmith* opinion) did not violate ex post facto principles incorporated in the Due Process Clause of the Fourteenth Amendment, and that the OCCA's application of controlling Supreme Court precedent was not unreasonable. *See Evans*, 390 F.3d at 1252–54. Defendant argues that *Evans* was wrongly decided because it did not take into account language in OCCA opinions showing that the OCCA had reversed course on the *mens rea* element. We are not persuaded. But even if we were, a panel of this court may not overturn a decision of a prior panel on what is purely a legal issue. *See, e.g., United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000).

Defendant's equal-protection argument is that if *Hockersmith* and *Bannister* represented a new rule of law, that rule must be applied to him because those cases were pending on direct appeal when his case was. The argument fails. Indeed, he cites to us no relevant authority under the Equal Protection Clause. (That he chose to cite *Bush v. Gore*, 531 U.S. 98 (2000), is a good indicator of the absence of decisions in point.) His best case is *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), which held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." But that decision, although certainly founded on notions of equal justice, did not rely on the Equal Protection Clause and could not create clearly established law regarding the Clause.

B.    **Eighth Amendment**

16

Defendant argues that "[t]he attenuated *mens rea* requirement for first-degree child abuse murder moves it out of the category of crimes for which a death sentence may be imposed Constitutionally." Aplt. Br. at 68. He contends that the Supreme Court's decisions in *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), prohibit the death penalty absent an additional finding of culpability, and that no such finding was made in his case. *See* Aplt. Br. at 68–77. Again, however, Defendant cannot overcome circuit precedent to the contrary.

In *Workman v. Mullin*, 342 F.3d 1100, 1103–04 (10th Cir. 2003), we applied *Enmund* and *Tison* to the identical issue, holding that "an additional culpability finding as might be required by *Enmund* or *Tison* in order to apply the death penalty for a felony murder conviction does not apply when the defendant actually killed his victim, as was the case here." *See also Malicoat v. Mullin*, 426 F.3d 1241, 1254–55 (10th Cir. 2005). That language governs this appeal. Defendant attempts to distinguish *Workman*, arguing:

> In the *Workman* case there was apparently no evidence Mr. Workman was operating under a disability or that anything other than the force applied directly by Mr. Workman to the victim was responsible for the death. That appears to be true in *Malicoat* as well. In the instant case, however, the evidence is that Mr. Fairchild was heavily intoxicated and that the victim may have died not from a blow struck directly by Mr. Fairchild but from a fall and head injury precipitated by Mr. Fairchild's actions. The evidence could and should have been that Mr. Fairchild is brain damaged. Moreover, Mr. Fairchild's brain damage was potentiated by alcohol and had both judgment and perception impairing effects.

Aplt. Br. at 70. But our reasoning in *Workman* does not allow for the distinctions Defendant advances. We simply read Supreme Court precedent to require an additional

17

culpability finding only when the defendant did not kill the victim. Here, there can be no question that the jury found that Defendant killed the child.

### C. Failure to Give Lesser-Offense Instructions

In *Beck v. Alabama*, 447 U.S. 625, 627 (1980), the Supreme Court held as a matter of due process that a death sentence may not be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict" (internal quotation marks omitted). Thus, to succeed on this issue, Defendant must show that second-degree murder is a lesser offense of child-abuse murder in the context of this case. But his sole argument on that score is that voluntary intoxication would negate the *mens rea* required for child-abuse murder and render his offense second-degree murder. As we have already explained, however, the OCCA has ruled contrary to Defendant on the *mens rea* requirement, and we cannot set aside that ruling. And as Defendant concedes, whether an offense is a lesser-included-offense of the charged offense is a matter of state law. *See Malicoat*, 426 F.3d at 1252. Defendant's *mens rea* challenge having failed, *Beck* cannot assist him.

## IV. INSTRUCTION ON LIFE-WITHOUT-PAROLE OPTION

During the sentencing phase of Defendant's trial, the court instructed the jury that it could impose one of three possible sentences—life, life without parole, or (upon appropriate findings) death. The defense requested, and the trial court declined to give, an instruction on the meanings of a life sentence and a sentence of life without the

18

possibility of parole. *See Fairchild*, 998 P.2d at 629. The jury was unsure about the meaning of life without parole and sent the judge a note asking whether it meant that Defendant would never be released. The court advised the jury, "You have all of the evidence you need to decide this case." Tr., Vol. VI at 1484 (internal quotation marks omitted).

Defendant contends that the jury note demonstrates confusion about the life-without-parole option and that the trial court's instructions and response to the note do not comport with Supreme Court precedent. The OCCA rejected this claim on direct appeal, stating that the trial court had no duty to explain the Oklahoma parole process and citing previous decisions on the point. *See Fairchild*, 998 P.2d at 629. That decision is entitled to AEDPA deference. We have so held in an indistinguishable case, *Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013). In *Littlejohn* the jury, having been instructed on the three available sentencing options under Oklahoma law, submitted a note asking the trial court whether it was "possible to change the verdict of life without parole to with parole" after the verdict and without another jury verdict. 704 F.3d at 826 (internal quotation marks omitted). There, as here, the trial court conveyed to the jurors that they "have all the law and evidence necessary to reach a verdict," and rejected counsel's request to elaborate on the meaning of the three alternatives. *Id.* (internal quotation marks omitted). In both cases the jury's concern was whether life without parole really meant that the defendant would never be released. We denied relief in *Littlejohn, see id.* at 831, and are bound by precedent to do so here.

19

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim that trial counsel was ineffective, a defendant must establish (1) that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.  In the context of a capital-sentencing proceeding, "the question is whether there is reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.* at 695.  Our review is "highly deferential" and we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (internal quotation marks omitted).  To prevail on a claim of ineffective assistance of appellate counsel, a defendant must establish that counsel was objectively unreasonable in failing to raise or properly present a claim on direct appeal, and that there is a reasonable probability that, but for this unreasonable failure, the claim would have resulted in relief on direct appeal.  *See Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

Defendant claims that "[t]rial and appellate counsel were ineffective for failing to discover, present and preserve issues relating to [his] head trauma and resulting organic deficits," and that the district court erred in failing to grant an evidentiary hearing on this

20

claim. Aplt. Br. at 2. He argues that "[c]ounsel's failure to investigate and develop for the jury the defense that [he] was impaired not only by alcohol but by organic brain damage with synergistic effect eliminated an effective defense to the death penalty as well as additional support for lesser included offense instructions," and that "[t]his failure was nonstrategic as counsel did put on a form of diminished capacity defense, just a very poor one." *Id.* at 14. Before addressing Defendant's claim, we provide additional background.

Defendant raised no claim on direct appeal of ineffective assistance of trial counsel. He first raised ineffectiveness claims in his original application for postconviction relief, filed March 16, 1998—nine months after he submitted his opening brief in his direct appeal but before the OCCA had issued its first opinion in the direct appeal. The claim alleged that "[t]rial counsel's failure to conduct reasonable investigation and presentation of relevant mitigating evidence denied [Defendant] effective assistance of counsel and rendered his death sentence unreliable." R., Vol. III Capital Post Conviction Proceeding, Appl. for Post-Conviction Relief – Death Penalty 4th issue at 5, *Fairchild*, No. PC-98-31 (Okla. Crim. App. Mar. 17, 1998)). It also alleged that appellate counsel had been ineffective for failing to raise the issue. It asserted that "[p]ost-conviction investigation has revealed that [Defendant] suffered from significant psychiatric impairment and brain damage which affected his judgment and reduced his culpability" for Adam's death, and it noted his history of drug use, amateur

21

boxing, and serious head injuries. *Id.* at 17. In support, Defendant submitted medical records and some articles about the risk of brain injuries from boxing and other sports.

The OCCA held that the claim of ineffective assistance of trial counsel was waived because it could have been raised on direct appeal. *See* Aplt. Br. attach. G. Nevertheless, the OCCA addressed the merits of the claim and rejected it on the ground that trial counsel had not been deficient, *see id.*; *Fairchild*, 579 F.3d at 1140, 1147–48, thereby effectively disposing of the claim of ineffective assistance of appellate counsel, *see Cargle*, 317 F.3d at 1202 (appellate counsel's omission of meritless issue does not constitute deficient performance). The OCCA also denied Defendant's requests for discovery and an evidentiary hearing.

In his § 2254 application, filed May 16, 2002, Defendant argued that "[t]rial and appellate counsel were ineffective for failing to discover, present, and preserve issues relating to [Defendant]'s head trauma and resulting organic deficits." R., Vol. II, Habeas Appl. at 69 (full capitalization omitted). The claim did not mirror his state-court claim because it referred to evidence not presented to the OCCA. Defendant submitted a May 2, 2002 affidavit from psychiatrist Dr. Smith, his trial expert, and an April 24, 2002 affidavit from Dr. Barry Crown, a neuropsychologist, both of which said that Defendant had organic brain damage. Dr. Smith's affidavit described a report he had prepared for trial as indicating that Defendant "suffered from a severe organic brain syndrome of an acute and chronic nature," and as reflecting that he had "uncovered evidence of organic brain damage during [his] clinical interview." *Id.* Ex. J ¶ 9. The affidavit also said that at

the time of trial Dr. Smith had been "concerned that there was to be no neuropsychological testing," *id.* ¶ 6, and that "[t]here was little or no discussion" of his findings during the brief conversation he had with defense counsel shortly before he testified, *id.* ¶ 10. Dr. Crown's affidavit said that Defendant's medical records and neuropsychological tests (conducted in April 2002) showed that Defendant had organic brain damage. It noted "[m]ajor neurological markers" for Defendant, including his history of amateur boxing, bar fights, head injuries with periods of unconsciousness, and abuse of alcohol and other substances, as well as Dr. Smith's finding of chronic organic brain damage. *Id.*, Ex. I at 4. In particular, the affidavit said that the brain damage was "primarily associated with the fronto-temporal portions of the brain," which would reduce Defendant's capacities in "[r]easoning, judgment, and problem solving" and would likely impair his ability to control impulses. *Id.* at ¶¶ 10–11. These impairments, the affidavit asserted, "would be markedly potentiated or increased by alcohol intoxication." *Id.* ¶ 12.

The application contended that trial counsel's performance was deficient because counsel had not investigated Defendant's history of head injuries and its impact on brain function before settling on a defense based on alcoholism and voluntary intoxication at the time of the crime, and because counsel spent little time with Dr. Smith and did not discuss Smith's finding of chronic organic brain damage. It also argued that the ineffectiveness of Defendant's direct-appeal counsel (who had not raised a claim of ineffective assistance of trial counsel) constituted cause for his failure to present the trial-

counsel claim on direct appeal, thereby overcoming any state procedural bar. The district court denied relief, but granted a COA on the ineffectiveness claim (as well as other claims). *See Fairchild*, 579 F.3d at 1138–39.

On appeal we reversed and remanded on the ineffective-assistance claim. Although the ineffectiveness claim in the § 2254 application bore a resemblance to the ineffectiveness claim presented to the OCCA in Defendant's state postconviction application, it was "of a substantially different nature, based on evidence and arguments that were not previously considered by the OCCA." *Id.* at 1148. The Smith and Crown affidavits, presented for the first time in the § 2254 proceeding, "establish[ed] the link between [Defendant']s prior history of drug abuse and head injuries *and* possible physical, organic brain injury; and furnish[ed] evidence that he in fact had such an injury." *Id.* at 1149. Together, the affidavits "suggest more than alcohol-induced explosiveness (*i.e.*, that [Defendant] was a mean drunk)—they point to the possibility of separate physical brain damage, which could be aggravated in a pathologically severe way by the ingestion of alcohol." *Id.* at 1150.

We concluded that this new evidence "significantly altered" Defendant's ineffective-assistance claim, "placing it in a much stronger legal posture than in the state court proceedings." *Id.* at 1150–51 (internal quotation marks omitted). While recognizing that Defendant had not argued that the claim presented in the § 2254 application was a "new" claim, *see id.* at 1148 & n.7, we explained that "at a certain point, when new evidence so changes the legal landscape that the state court's prior

24

analysis no longer addresses the substance of the petitioner's claim, we must necessarily say that the new evidence effectively makes a new claim—one that the state court has not adjudicated on the merits," *id.* at 1149. Given our conclusion and the prohibition on granting relief on the merits before the claim has been exhausted in state court, *see id.* at 1151; 28 U.S.C. § 2254(b)(1)(A), we vacated the district court's judgment and remanded for it to determine whether Defendant was entitled to have his § 2254 proceedings abated to permit him to exhaust his claim in state court, *see Fairchild*, 579 F.3d at 1147, 1152–56; *Rhines v. Weber*, 544 U.S. 269, 275–78 (2005) (authorizing stay-and-abeyance procedure). (Our prior decision predated *Cullen*, which held that review under § 2254 is generally limited to the evidence presented in state court. *See* 131 S. Ct. at 1398. In light of *Cullen*, we may have reframed our remand as providing Defendant an opportunity to present the new evidence to the OCCA. As a practical matter, however, the proceedings would have been the same on remand.)

Following our suggestion, Defendant filed a second postconviction application in state court on October 9, 2009. It presented claims of ineffective assistance of trial and appellate counsel that referred to the 2002 affidavits offered with the § 2254 application. The OCCA denied the application. The court held that the application was procedurally barred on two grounds. First, it was untimely under Rule 9.7(G)(3) of the Rules of the Oklahoma Court of Criminal Appeals, Okla. Stat. tit. 22, Ch. 18., App., which provides that "[n]o subsequent application for post-conviction relief shall be considered by this Court unless it is filed within sixty (60) days from the date the previously unavailable

25

legal or factual basis serving as the basis for a new issue is announced or discovered."

*See* R., Vol. I at 231–33. And it was also barred under Okla. Stat. tit. 22, § 1089, which requires (among other things) that a successive postconviction application must contain (1) "claims and issues that have not been and could not have been presented previously in a timely [application] because the legal basis for the claim was unavailable," or (2) "sufficient specific facts establishing that" the claim's factual basis was not ascertainable through the exercise of reasonable diligence on or before the date of the prior application. *See id.* at 231.

The OCCA concluded that the claims did not qualify for consideration because (1) the supporting facts were available to both trial and appellate counsel; (2) the claims had been the subject of the ineffective-assistance claim in Defendant's first postconviction application; and (3) there could be no relief based on "newly discovered evidence" because the affidavits containing facts alleged to warrant relief were dated seven years before the second application was filed and so were not presented within 60 days of discovery of the facts. *See id.* at 232–33. The OCCA added that § 1089 also barred consideration because the claims merely expanded on the theories of the first postconviction application; the evidence "merely builds upon evidence previously presented"; and "this same issue was raised under an ineffective assistance of counsel claim in [Defendant's first postconviction application]." *Id.* at 233, Dec. 1, 1999 Op. Den. Subsequent Appl. at 4. Also, the OCCA stated that it "fail[ed] to find that [Defendant] has suffered or will suffer a miscarriage of justice based on these claims,"

26

and therefore it "decline[d] to exercise [its] inherent power to grant relief when other avenues are barred or waived." *Id.* at 233–34; *see id.* at 232 ("The law favors the legal principle of finality of judgment and [Defendant] has not shown that failure of this Court to review his claims would create a miscarriage of justice."). The OCCA concluded that an evidentiary hearing would not be necessary "because [Defendant's] claims are both waived and barred and do not otherwise merit relief." *Id.* at 234.

The federal district court then denied relief on the § 2254 application, ruling that the remanded claim was procedurally barred and incorporating its prior decision denying the remaining claims in the application. Aplt. Br. attach. C at 7–10.

We now turn to the ineffective-assistance issues on this appeal. We first address the claim we described as the "new" claim in the initial appeal, which we remanded to the district court for further proceedings. We then turn to the claim that we previously said had been properly exhausted.

A.     The Remanded Claim

Because the OCCA refused on procedural grounds to consider Defendant's ineffective-assistance claims insofar as they were based on the 2002 affidavits, we would ordinarily be foreclosed from granting relief on that basis. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or

27

demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."). But Defendant raises several arguments why we are not foreclosed.

First, Defendant argues that it was not necessary for him to return to the OCCA for his second postconviction application because the state had previously waived any contention that his claims based on the 2002 affidavits were not exhausted. But as we stated in the prior appeal in this case, AEDPA provides that a state can waive exhaustion only through an express waiver by its counsel. *See* 28 U.S.C. § 2254(b)(3); *Fairchild*, 579 F.3d at 1148 n.7. There was no express waiver here.

Second, Defendant argues that the state procedural bar does not preclude merits review because the state bar is not independent of federal law. *See Black*, 682 F.3d at 918 (federal habeas review not precluded if state procedural bar depends on federal constitutional ruling). He relies on *Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002), which said that even when a prisoner has failed to comply with procedural requirements, the OCCA has the "power to grant relief when an error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right," *id.* at 710. He argues that the OCCA considered the merits of his federal ineffective-assistance claims "before, or in the course of, imposing a state default" because the court's decision cited *Valdez*. Aplt. Br. at 25. In essence, Defendant is asserting that the OCCA will not impose a procedural bar unless it first determines that any federal claims lack merit. But the OCCA explicitly informed this court in *Black*, in response to our certified question, that it had not considered the merits of the federal

28

claims in applying § 1089 to bar the defendant's postconviction application. *See Black v. Tram[m]ell*, 485 F. App'x 335, 336 (10th Cir. 2012). And we held in *Banks v. Workman*, 692 F.3d 1133, 1146 (10th Cir. 2012), that a procedural bar under § 1089 is not dependent on federal law, noting that the OCCA has permitted review under *Valdez* only in extraordinary circumstances and that the merit of the federal claim was neither a necessary nor sufficient condition for such review. Defendant attempts to distinguish our precedents on the ground that the OCCA's denials of review in those cases did not cite *Valdez*, whereas here the OCCA opinion reported that Defendant had invoked *Valdez*.

We are not persuaded. Yes, one can infer from the citation to *Valdez* that the OCCA considered *Valdez* in denying review to Defendant. But surely the OCCA in every case, whether or not it mentions *Valdez* explicitly, is well aware of the discretion afforded it by that decision. The issue is not whether the OCCA considered *Valdez* but whether it considered the merits of the federal claims in doing so. And there is nothing to suggest it did. Therefore, we follow *Banks* in holding that the OCCA's invocation of the procedural bars of § 1089 and Rule 9.7(3)(G) was independent of a determination of federal law.

Third, Defendant argues that even if there would otherwise be an effective state procedural bar, he can establish cause for his failure to comply with state requirements—namely, that in his initial postconviction proceeding he was provided ineffective assistance by his counsel, who failed to uncover and present in support of his claims of ineffective trial and appellate counsel the evidence later presented in the 2002 affidavits.

29

The Supreme Court held in *Coleman* that ineffective assistance of counsel in postconviction proceedings does not establish cause for the procedural default of a claim. *See* 501 U.S. at 756–57. But the Supreme Court's recent decisions in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), revised that rule with respect to cause for claims of ineffective assistance of counsel.

The Court's concern in both cases was "initial-review collateral proceeding[s]," which it defined as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315. It held in *Martinez* that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* The context was Arizona law, which prohibited claims of ineffective assistance of trial counsel on direct appeal and required that such claims be raised in state postconviction proceedings. *See id.* at 1314. The Court observed that in Arizona, "the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim," *id.* at 1317, and that "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims," *id.* at 1316. *Martinez* held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial" when state law provides that "claims of ineffective assistance of trial counsel must be raised in an initial-review collateral

30

proceeding" and "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1320.

*Trevino* took the Supreme Court one step further, holding that the rule in *Martinez* applied even when the state provided a theoretical opportunity to raise on direct appeal a claim of ineffective assistance of trial counsel, but the design and operation of the state's procedural requirements for doing so often made that theoretical possibility a practical impossibility. *See* 133 S. Ct. at 1915, 1921. In *Trevino* a Texas state-court jury convicted Trevino of capital murder and the trial court imposed the death penalty based on the jury's findings after a sentencing hearing. *See id.* at 1915. Trevino's new appointed counsel did not raise on direct appeal a claim of ineffective assistance of trial counsel during the sentencing hearing. *Id.* A different attorney appointed to represent Trevino on state postconviction review raised a claim that trial counsel was constitutionally ineffective during the sentencing phase of Trevino's trial, but the attorney did not claim that trial counsel's ineffectiveness included inadequately investigating and presenting mitigation evidence. *See id.* After relief was denied on state postconviction review, Trevino sought habeas relief in federal court, where he was represented by another new appointed counsel. *See id.* That attorney uncovered mitigation evidence that had not been presented at trial and raised for the first time a claim that Trevino's trial counsel was ineffective during the sentencing phase by failing to adequately investigate and present this other mitigation evidence. *See id.* at 1916. The federal court stayed proceedings to permit Trevino to raise this claim in state court, but the state court held

31

that the claim was procedurally defaulted because it had not been raised on initial state postconviction review. *See id.* The federal district court denied the claim of ineffective assistance of counsel on the ground that an independent and adequate state ground (failure to raise the claim on initial state postconviction review) barred federal habeas review. *See id.* The Fifth Circuit affirmed. *See id.*

The Supreme Court reversed. It noted that "the inherent nature of most ineffective assistance of trial counsel claims means that the trial court record will often fail to contain the information necessary to substantiate the claim." *Id.* at 1918 (brackets and internal quotation marks omitted). But in Texas the only way for a defendant to supplement the record on appeal is by filing in the trial court a motion for a new trial within 30 days of sentencing. *See id.* The trial court then has to decide the motion within 75 days of sentencing. *See id.* The trial transcript, however, is not due until 120 days after sentencing, and the time may be extended. *See id.* The Supreme Court concluded that this mechanism "is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point." *Id.* (internal quotation marks omitted). Trevino's appellate counsel was appointed eight days after sentencing, which meant that she had 22 days to move for a new trial. *See id.* at 1919. Counsel may have had 45 more days to gather evidence in support of the motion (before the trial court had to issue a decision), but she would not have had access to the trial transcript, which did not become available until seven months after trial. *See id.* As the Court said, "It would have been difficult, perhaps impossible, within that time frame to investigate Trevino's

32

background, determine whether trial counsel had adequately done so, and then develop evidence about additional mitigating background circumstances." *Id.* The Court concluded that "where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies." *Id.* at 1921.

The question before us is whether *Trevino* applies to Oklahoma's procedures. We think not, because Oklahoma provides a reasonable time to investigate a claim of ineffective assistance before raising it on direct appeal. A claim of ineffective assistance can be raised with the opening brief on appeal. And the brief can be accompanied by a request to supplement the record. OCCA Rule 3.11 specifically contemplates such supplementation for claims like the one before us. It provides:

> A request to supplement the record on appeal with matters not presented to and included as a part of the trial court record is only available under the following two circumstances:
>
> . . . .
>
> (b) When an allegation of the ineffective assistance of trial counsel is predicated upon an allegation of failure of trial counsel to properly utilize available evidence or adequately investigate to identify evidence which could have been made available during the course of the trial, and a proposition of error alleging ineffective assistance of trial counsel is raised in the brief-in-chief of Appellant.

Rule 3.11(B). The time to investigate such a possible claim is much longer than under Texas procedure, and the trial transcript is available for much of that time. The opening brief is not due until 120 days from the date the OCCA receives the trial record and

33

transcripts, *see* Okla. Stat. tit. 21, § 701.13(D); Rule 9.3(A), and that deadline may be extended up to an additional 60 days by a single OCCA judge (the Presiding or Vice-Presiding Judge), *see* Rule 3.4(D)(2)(a), and possibly even further upon the approval by the full court, *see id.* The record and transcripts are not required to be filed in the trial court until six months after sentencing, *see* § 701.13(A); Rule 9.2(C)(1); *id.* 9.2(E), and the court reporter's deadline to file transcripts may be extended upon a showing of just cause, *see* Rule 9.2(C)(2).

In this case, the Oklahoma Indigent Defense System (OIDS) was appointed on February 2, 1996, the day Defendant was sentenced, to represent Defendant on direct appeal. Counsel received the record and transcripts ten months later, and Defendant's brief was due (after two 30-day extensions) six months later, on Monday, June 2, 1997. Thus, Oklahoma procedure allowed appellate counsel to file the brief, along with a Rule 3.11 motion to supplement the trial record, 16 months after Defendant was sentenced, with access to the transcript and record for nearly six months.

Numerous appeals during the years preceding and following the filing of Defendant's appellate brief with the OCCA show that counsel could raise claims of ineffective assistance of trial counsel on direct appeal, including claims related to the failure to investigate and present mitigation evidence. *See, e.g., Washington v. State*, 989 P.2d 960, 976 (Okla. Crim. App. 1999) (OIDS Capital Direct Appeals Division asserted numerous claims of ineffective assistance of trial counsel, including claim that "counsel failed to adequately prepare, investigate and use available evidence during both

34

stages of trial"; relief granted); *Young v. State*, 992 P.2d 332, 347 (Okla. Crim. App. 1998) (public defender asserted failure to investigate mitigating evidence); *Wilson v. State*, 983 P.2d 448, 471–72 (Okla. Crim. App.1998) (OIDS Capital Direct Appeals Division asserted failure "to fully investigate [defendant's] mental health background or effectively assist [mental-health expert prepare] for his second stage testimony"); *Patton v. State*, 973 P.2d 270, 303–04 (Okla. Crim. App. 1998) (public defender asserted failure to request continuance to investigate additional mitigation evidence); *Taylor v. State,* 972 P.2d 864, 864–66 (Okla. Crim. App. 1998) (Rule 3.11 motion granted on ineffective-assistance claims based on failure to hire psychologist earlier in trial preparation and to use him effectively in developing trial strategy, failure to prepare adequately for trial, and failure to call second-stage mitigation witnesses); *Douglas v. State*, 951 P.2d 651, 680 (Okla. Crim. App. 1997) (OIDS asserted failure to present available mitigating evidence from mental-health expert); *Bryan v. State*, 935 P.2d 338, 361–63 (Okla. Crim. App. 1997) (OIDS Capital Direct Appeals Division asserted failure to present available evidence of mental illness); *Fields v. State*, 923 P.2d 624, 635 (Okla. Crim. App. 1996) (public defender asserted failure to present more mitigating evidence); *Allen v. State*, 923 P.2d 613, 617 (Okla. Crim. App. 1996) (public defender asserted failure to present mental-health mitigation evidence, including diagnoses of inadequate personality disorder and organic brain damage), *vacated on other grounds, Allen v. Oklahoma*, 520 U.S. 1195 (1997); *Cargle v. State*, 909 P.2d 806, 832–33 (Okla. Crim. App. 1995) (OIDS Capital Direct Appeals Division asserted failure to prepare and present adequate

mitigating evidence), *superseded by statute on other grounds*, *as stated in Coddington v. State*, 142 P.3d 437, 452 (Okla. Crim. App. 2006); *Mayes v. State*, 887 P.2d 1288, 1314–16 (Okla. Crim. App. 1994) (public defender asserted failure to present mitigation evidence); *Malone v. State*, 876 P.2d 707, 712–13 (Okla. Crim. App. 1994) (failure to investigate and present mitigation evidence).

In view of the foregoing, Defendant has not shown that the "design and operation" of Oklahoma's procedural framework "make[] it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921.

Nevertheless, Defendant argues that *Trevino* applies to the specific circumstances of his case. He relies on a disclaimer filed in the OCCA by his direct-appeal counsel on June 6, 1997, four days after filing Defendant's direct-appeal brief. The disclaimer announced that appellate counsel "*has not conducted and cannot conduct* a full investigation of [Defendant's] case," R., Vol. II, Habeas Appl. app. K., Disclaimer by Direct Appeal Counsel at 2, and that "the investigation into any claims outside the trial record in [Defendant's] case, including Sixth Amendment ineffective assistance of trial counsel claims, has been limited to those that are apparent from the trial record or from interviews with trial counsel and the client," *id.* at 7. The disclaimer also advised that counsel had not filed a motion to supplement the record under Rule 3.11. *See id.* at 2 n.3.

As we understand the disclaimer, it asserts that until *Walker v. State*, 933 P.2d 327 (Okla. Crim. App. 1997), *overruled by statute on other grounds*, *as recognized in Davis*

36

*v. State*, 123 P.3d 243, 245 (Okla. Crim. App. 2005), decided four months before the disclaimer was filed, the OCCA had not required that claims of ineffective assistance of trial counsel based on facts outside the trial record be raised on direct appeal, and the Capital Direct Appeals Division of the state public defender (which was distinct from the Capital Post-Conviction Division) did not have the resources to take on this new responsibility. But the disclaimer does not call into question that Oklahoma law did not preclude raising on direct appeal a claim of ineffective assistance of trial counsel—either as prohibited by state law, as in *Martinez,* or as a practical consequence of that law, as in *Trevino*—and that the OIDS had regularly done so in the past. Defendant's state postconviction application was therefore not an initial-review collateral proceeding under the *Martinez/Trevino* definition of the term, *see Martinez*, 132 S. Ct. at 1315 ("initial-review collateral proceedings" are "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial"), so ineffective assistance of counsel in the postconviction proceeding cannot establish cause to overcome the procedural bar. Of course, the disclaimer could establish the predicate for a claim of ineffective assistance of direct-appeal counsel, and Defendant indeed raised such a claim in his initial postconviction application to the OCCA—a claim rejected on the merits.

However sympathetic we may be to Defendant's direct-appeal counsel, the OCCA cases previously cited confirm that the appellate defender had been raising similar ineffective-assistance claims on direct appeal for some time. And if direct-appeal

37

counsel performed poorly, Defendant had the opportunity to raise that problem with the OCCA in postconviction proceedings.

## B.    The Exhausted Claim

There remains the more-limited ineffectiveness claim raised in Defendant's original state postconviction application—the claim without reliance on the 2002 affidavits first presented with Defendant's § 2254 application.  But in this court Defendant makes no argument about the merits of the exhausted claim.  Although his opening brief cites two exhibits that were presented with the original application, it does not discuss the evidence presented to the OCCA in support of that claim.  His merits argument is based solely on the theory of organic brain damage and evidence presented for the first time in his § 2254 application; there is no argument that he is entitled to relief on the exhausted claim if the remanded claim is procedurally barred.  "Even a capital defendant can waive an argument by inadequately briefing an issue." *Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013).  Defendant has done so here, waiving any argument that he is entitled to relief on the exhausted claim.  *See also id.* ("perfunctory assertion falls well short of what's needed to overturn a judgment"); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

Waiver aside, Defendant has provided no basis upon which we could conclude that the OCCA's ruling on the exhausted claim is contrary to or an unreasonable

38

application of *Strickland*, 466 U.S. 668. The OCCA explained that the proffered evidence—medical records indicating a history of substance abuse and head injuries, and articles concerning boxing and other sports-related brain injuries—was insufficient to demonstrate a causal connection between Defendant's prior boxing activities or head injuries and his brain function at the time of the crime. Aplt. Br. attach. G at 9. Also, there was no evidence that trial counsel had not investigated the matter raised in the postconviction application. *Id.* at 8; *see Fairchild*, 579 F.3d at 1147–48. And the court observed that jurors may have considered evidence of Defendant's drug use and boxing to be aggravating rather than mitigating factors. Aplt. Br. attach. G at 8. The OCCA's conclusions, based on the evidence before it, that "[a]n experienced trial attorney may very well have chosen as reasonable trial strategy to hide these factors rather than emphasize them," *id.* at 9, and that failure to present this evidence at trial did not establish deficient performance of counsel, *see id.* at 10, are not contrary to or an unreasonable application of *Strickland*. Absent a showing of ineffective assistance of trial counsel, the claim that appellate counsel was ineffective in not raising the trial-counsel ineffectiveness claim was doomed to fail as well. *See Cargle*, 317 F.3d at 1202 (appellate counsel's omission of meritless issue does not constitute deficient performance). There can be no relief on the exhausted claim.

In light of our disposition of Defendant's ineffectiveness claims, an evidentiary hearing would serve no purpose.

## VI.    CUMULATIVE ERROR

39

Defendant contends that the cumulative effect of all of the constitutional errors in his case warrants federal habeas relief. The OCCA denied this claim on direct appeal, *Fairchild*, 998 P.2d at 632, as did the district court below. In the federal habeas context, cumulative-error analysis "aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless," an analysis we undertake only if there are at least two errors. *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013) (internal quotation marks omitted). Because we have not identified any preserved errors, we must reject the claim of cumulative error.

## VII.  CONCLUSION

We AFFIRM the district court's judgment.