**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 23, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LARRY ALAN WHITELY,

    Petitioner - Appellant,

v.

JIM FARRIS, Warden,

    Respondent - Appellee.

No. 18-6085
(D.C. No. 5:16-CV-00514-HE)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

Petitioner Larry Whitely is a state prisoner in Oklahoma. A jury convicted him of two counts of lewd molestation of a minor, and the judge sentenced him to concurrent twenty-year terms of imprisonment. The Oklahoma Court of Criminal Appeals upheld his conviction and sentence on direct appeal and ultimately affirmed a state district court's denial of his request for post-conviction relief. Petitioner then filed a habeas petition under 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma, which the federal district court denied. He now

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

appeals the federal district court's denial of his petition. Our jurisdiction arises under 28 U.S.C. §§ 1291 and 2253. We affirm.

I.

In 2006, Petitioner's step-daughter, K.B.—then in fifth grade—passed a note to her friends N.M. and L.W. at school stating that her dad had been raping her. L.W. told her mother about the note. Authorities removed K.B. and her younger sister from her home. Tracy Koelling, a forensic interviewer, subsequently interviewed K.B. Law enforcement officer Jeffrey Cox—a police officer with the Noble, Oklahoma police department—observed the interview. K.B. denied worrying about anything, said she missed her cat, and told Koelling that she felt safe in her home. Two days later, Officer Cox himself interviewed K.B. K.B. continued to say that she missed her mother, wanted to go home, and had nothing further to say. Officer Cox asked K.B. about the note. K.B. denied passing the note, said a friend had passed the note, and said the friend had falsely reported the content of the note. Cox told K.B. that he had talked to N.M. and L.W. and that K.B. needed to tell him what was wrong. K.B. then began to cry and alleged that Petitioner had, in fact, raped her.

Cox told Koelling that K.B. had made more disclosures. Koelling then interviewed K.B. a second time, two days after K.B.'s interview with Officer Cox. At that interview, K.B. told Koelling that Petitioner had anally raped her on numerous occasions. She said that she wrestled with Petitioner and the wrestling would sometimes lead to forced anal rape. K.B. said that she had fought back every time. She also said that Petitioner had not put anything on his penis, but the anal rapes had not hurt or made

2

her bleed. K.B. also described Petitioner's penis as "soft and gooey" and his ejaculate as "really cold."

Oklahoma charged Petitioner with two counts of lewd molestation of a minor. Before and after Petitioner's trial on those charges, K.B.'s mother, Kelly Whitely ("Mrs. Whitely"), sought the return of her children and agreed to take various steps to get her children back. On numerous occasions before trial, employees of the Oklahoma Department of Human Services indicated to Mrs. Whitely that it was important that she believe and support K.B. if she wanted her children back. At various times, Mrs. Whitely indicated to DHS employees that she did or did not believe K.B.'s allegations.

At trial, L.W. testified regarding the note K.B. had written. She also testified that people at school had called K.B. a liar.

K.B. testified regarding the abuse. She testified that Petitioner had forced his penis into her anus and that she had fought back. She also testified that she had been able to hit Petitioner with her shoes and kick him hard enough for him to flip over backwards, at which point she would run and hide from him in her closet or under her bed. In addition, K.B. testified that the abuse had not hurt and that she had not bled. She admitted that she had previously gotten in trouble for lying about other matters.

Dr. Mark McKinnon, M.D., testified that his examination had revealed no physical indications of sexual abuse. He also testified that in more than ninety percent of cases, no physical signs of sexual abuse exist and that the anal region of the body heals quickly because it is highly vascularized. He further testified that he would not be surprised if a victim lacked signs of abuse despite having been abused anally for a long period of time.

3

He explained that an abrasion could exist but not appear three weeks later on a physical exam.

Dr. McKinnon also conceded, though, that anal sex can cause injury and he opined that the likelihood of an anal injury occurring would depend on the size of the object introduced, the use or nonuse of force, the use or nonuse of lubricants, and the amount of victim cooperation. He acknowledged, too, that frequent, forceful anal penetration would lead to a greater risk of injury, conceded that an anal tear could leave a scar, and noted that he had not found any such scars.

Dr. Linda Ingraham, Ph.D., testified that Koelling had conducted a proper child forensic interview. She then discussed various factors that could have affected K.B.'s memory, such as bias, suggestibility, misattribution, memory recording, and positive versus negative reinforcement. She also criticized Officer Cox's interview; identified various inconsistences in K.B.'s allegations that she would generally not expect; and concluded that it was possible that the interview with Officer Cox had distorted K.B.'s memory.

Koelling testified about her interviews with K.B.[1] She also discussed proper techniques for interviewing child victims of sexual assault.

Mrs. Whitely also took the stand and briefly testified. During her testimony, she stated that she had not seen any blood on K.B.'s underwear or clothes when K.B. had been living with her. She also indicated that she had been looking for blood because she

---

[1] A video of her first interview and an edited video of her second interview were also played for the jury and entered into evidence.

had believed that K.B. would start menstruating soon. On cross-examination, she testified that she was not at the trial to support Petitioner and that their divorce was pending.

Petitioner's father, Larry Whitely, Sr., also took the stand. During his testimony, Petitioner submitted pictures his father took into evidence. Those pictures indicated that no space existed for K.B. to hide under the bed and that her closet was small.

In his closing argument, Petitioner's trial counsel highlighted these inconsistencies, but the jury nevertheless convicted Petitioner on both counts. Between the trial and sentencing, Mrs. Whitely sent a letter to the trial judge indicating that she did not believe the allegations against Petitioner and had seen no signs of abuse. She expressed her belief that Petitioner was innocent and asked the judge to release him or give him the minimum punishment. At sentencing, Mrs. Whitely stood by her statements after she was warned that her testimony could prevent her from getting her children back. The judge sentenced Petitioner to concurrent twenty-year terms of imprisonment.

Petitioner appealed his convictions to the Oklahoma Court of Criminal Appeals (the "OCCA").[2] The OCCA affirmed the judgment.

Petitioner then filed an application for post-conviction relief (the "APCR") in state district court. In the APCR, Petitioner asserted claims based on prosecutorial

---

[2] None of the claims Petitioner asserts in this petition relate to his arguments on direct appeal.

misconduct, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. Petitioner also requested discovery and a full evidentiary hearing.

The state district court held that Petitioner waived his prosecutorial misconduct claims and ineffective assistance of trial counsel claims because he did not assert them on direct appeal. It denied Petitioner's discovery request for the most part, although it permitted Petitioner to depose his direct appeal appellate counsel. The court then held a two-day evidentiary hearing to address Petitioner's ineffective assistance of appellate counsel claims but limited the hearing to what appellate counsel did or did not do.[3] After the hearing, the court denied relief on the ineffective assistance of appellate counsel claims.

The OCCA reversed, holding the state district court failed to address a number of issues and applied the wrong legal standard.

On remand, the state district court determined that appellate counsel was ineffective because she had not engaged in any investigation outside the record before filing Petitioner's appeal. It then concluded that, even though it was unclear whether trial counsel had performed ineffectively, cause existed to grant Petitioner a new appeal to address Petitioner's ineffective assistance of trial counsel claims.

The state district court also noted that the OCCA had directed it to determine "whether witnesses were deterred by the prosecution, including DHS personnel, from

---

[3] The parties dispute whether we should address Petitioner's underlying claims as if an evidentiary hearing was held or whether the limits on the hearing rendered it equivalent to no hearing at all. We resolve this appeal without reaching that issue.

6

fully and truthfully testifying or whether the witnesses had changed their story after the fact because they no longer had anything to lose." Order dated Dec.19, 2014, Oklahoma v. Whitely, No. CF-2006-250, slip op. at 2. It determined that Petitioner had not produced sufficient evidence on that issue during the evidentiary hearing and thus did not grant any relief with respect to the prosecutorial misconduct claim.

Petitioner appealed and the OCCA again reversed the state district court because Oklahoma's statute governing post-conviction relief does not permit a court to grant a petitioner a second direct appeal. It then remanded the case to the state district court to resolve the remaining issues and make specific findings of facts and conclusions of law as to each issue. The OCCA concluded that the state district court could review the original record, allow depositions and affidavits for good cause, and/or conduct an evidentiary hearing.

On remand, the state district court determined that Petitioner's claims lacked merit without holding an evidentiary hearing. This time, the OCCA affirmed.

Petitioner then filed a petition in the United States District Court for the Western District of Oklahoma seeking habeas relief pursuant to 28 U.S.C. § 2254. The court denied that petition and denied Petitioner a certificate of appealability.

Petitioner appealed, and we granted a certificate of appealability allowing him to pursue his claims.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that we apply a "difficult to meet" and "highly deferential standard" in

7

federal habeas proceedings under 28 U.S.C. § 2254; it "demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (internal quotation marks omitted). When a petitioner includes in his habeas application a "claim that was adjudicated on the merits in State court proceedings," a federal court shall not grant relief on that claim unless the state-court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Section 2254(d)(1)'s reference to "clearly established Federal law, as determined by the Supreme Court of the United States," "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). "Federal courts may not extract clearly established law from the general legal principles developed in factually distinct contexts, and Supreme Court holdings must be construed narrowly and consist only of something akin to on-point holdings." Fairchild v. Trammell (Fairchild I), 784 F.3d 702, 710 (10th Cir. 2015) (internal quotation marks and citation omitted).

Under § 2254(d)(1), a state-court decision is "contrary to" the Supreme Court's clearly established precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts

8

that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [that] precedent." Williams, 529 U.S. at 405–06. A state court need not cite, or even be aware of, applicable Supreme Court decisions, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam).

A state-court decision is an "unreasonable application" of Supreme Court law if the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407–08. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Conversely, "[i]f a legal rule is specific, the range may be narrow," and "[a]pplications of the rule may be plainly correct or incorrect." Id. And "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, 529 U.S. at 410 (emphases in original).

If we determine that a state-court decision is either contrary to clearly established Supreme Court law or an unreasonable application of that law, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding, we then apply de novo review and may only grant habeas relief if the petitioner is entitled to relief under that standard. Milton v. Miller, 744 F.3d 660, 670–71 (10th Cir. 2014).

Claims not "adjudicated on the merits" in state court are entitled to no deference. Fairchild I, 784 F.3d at 711 (internal quotation marks omitted). But

9

"even in the setting where we lack a state court merits determination, '[a]ny state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by "clear and convincing evidence."'" Grant v. Royal, 886 F.3d 874, 889 (10th Cir. 2018) (alteration in original) (quoting Victor Hooks v. Workman (Victor Hooks II), 689 F.3d 1148, 1164 (10th Cir. 2012)).

With these standards in mind, we turn to Petitioner's claims.

III.

Initially, Petitioner asserts that the OCCA did not determine that his underlying ineffective assistance of trial counsel claims and prosecutorial misconduct claims were procedurally barred and that he properly presents those claims to us (rather than arguing that his appellate counsel was constitutionally ineffective for failing to assert those claims on direct appeal). We do not necessarily agree, but we need not resolve that issue because an ineffective assistance of appellate counsel claim lacks merit if the petitioner argues that appellate counsel should have asserted meritless claims. Ryder ex rel. Ryder v. Warrior, 810 F.3d 724, 746–47 (10th Cir. 2016). And for the reasons discussed below, we are satisfied that none of the claims Petitioner advances here have merit.

A. Ineffective Assistance of Trial Counsel

Petitioner contends that trial counsel acted ineffectively by failing to: (1) investigate a medical defense; (2) investigate and present expert forensic interview testimony; and (3) present additional evidence that K.B. was dishonest, manipulative, and attention-seeking.

10

## 1.  Legal Standard

We review claims of ineffective assistance of counsel under the framework set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Byrd v. Workman, 645 F.3d 1159, 1167 (10th Cir. 2011).  Under Strickland, a petitioner "must show both that his counsel's performance 'fell below an objective standard of reasonableness' and that 'the deficient performance prejudiced the defense.'"  Id. (emphasis omitted) (quoting Strickland, 466 U.S. at 687–88).  "These two prongs may be addressed in any order, and failure to satisfy either is dispositive."  Victor Hooks II, 689 F.3d at 1186.

"[O]ur review of counsel's performance under the first prong of Strickland is a 'highly deferential' one."  Byrd, 645 F.3d at 1168 (quoting Danny Hooks v. Workman, 606 F.3d 715, 723 (10th Cir. 2010)).  "Every effort must be made to evaluate the conduct from counsel's perspective at the time."  Littlejohn v. Trammell (Littlejohn I), 704 F.3d 817, 859 (10th Cir. 2013) (quoting United States v. Challoner, 583 F.3d 745, 749 (10th Cir. 2009)).  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Victor Hooks II, 689 F.3d at 1187 (quoting Byrd, 645 F.3d at 1168).  And the "petitioner 'bears a heavy burden' when it comes to overcoming that presumption."  Byrd, 645 F.3d at 1168 (quoting Fox v. Ward, 200 F.3d 1286, 1295 (10th Cir. 2000)).  "To be deficient, the performance must be outside the wide range of professionally competent assistance.  In other

11

words, it must have been completely unreasonable, not merely wrong." Danny
Hooks, 606 F.3d at 723 (internal quotation marks and citation omitted).

"A state prisoner in the § 2254 context faces an even greater challenge."
Victor Hooks II, 689 F.3d at 1187 (citing Byrd, 645 F.3d at 1168). "[W]hen
assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas
review, '[w]e defer to the state court's determination that counsel's performance was
not deficient and, further, defer to the attorney's decision in how to best represent a
client.'" Id. (alterations in original) (quoting Byrd, 645 F.3d at 1168). "Thus, our
review of ineffective-assistance claims in habeas applications under § 2254 is
'doubly deferential.'" Id. (quoting Knowles v. Mirzayance, 556 U.S. 111, 123
(2009)).

"Federal habeas courts must guard against the danger of equating
unreasonableness under Strickland with unreasonableness under § 2254(d).
When § 2254(d) applies, the question is not whether counsel's actions were
reasonable. The question is whether *any* reasonable argument exists that counsel
satisfied Strickland's deferential standard." Harrington v. Richter, 562 U.S. 86, 105
(2011) (emphasis added). And "because the Strickland standard is a general
standard, a state court has . . . more latitude to reasonably determine that a defendant
has *not* satisfied that standard." Byrd, 645 F.3d at 1168 (emphasis added) (ellipsis in
original) (quoting Knowles, 556 U.S. at 123).

"Under the prejudice prong [of Strickland], a petitioner must demonstrate 'a
reasonable probability that, but for counsel's unprofessional errors, the result of the

12

proceeding would have been different.'" Littlejohn v. Royal (Littlejohn II), 875 F.3d

548, 552 (10th Cir. 2017) (quoting Strickland, 466 U.S. at 694).

## 2. Claims

### i. Medical Defense

Petitioner argues that trial counsel was ineffective because he failed to

investigate a medical defense to the charges and that failure prejudiced him. In

support of his contention, he directs us to the affidavit of Dr. John H. Stuemky. That

affidavit opines that:

> [S]ome of the information disclosed by the girl indicating multiple
> episodes of anal rape and that it was forced and against her will, and in
> the absence of lubricant and not hurting is also rather difficult to believe.
> This includes feeling ejaculate and that it was cold. If all of the above
> occurred—forced anal rape, multiple times, without lubricant, against her
> will, [sic] would seem more likely that there should have been physical
> findings. All of the above would be of great concern.

Dr. Stumeky also notes that K.B.'s story of fighting back "simply does not fit

with ongoing child molestation by fathers/stepfathers" and that her "denial of pain

does not fit with her allegations of fighting back and that force was used."[4]

### a. Prior Decisions

---

[4] Respondent contends Petitioner did not properly present this evidence to the federal district court. We assume Petitioner properly presented the evidence because that assumption does not alter the outcome of the appeal.

We also note, although it is not entirely clear, that Petitioner appears to argue under this claim that he was prejudiced because Dr. Stuemky could not testify that Officer Cox's interview with K.B. presented a major conflict of interest and a risk of intimidation. But Petitioner waived that argument with respect to this claim because, before the federal district court, he only argued that the evidence was relevant to his forensic expert claim. See Stouffer v. Trammell, 738 F.3d 1205, 1221 n.13 (10th Cir. 2013).

The state district court rejected this claim because Dr. Stuemky's

> review of this matter . . . did not include a review [of] the testimony of Dr. McKinnon and . . . did not offer an opinion of whether he would agree or disagree with that testimony. In fact, although not offered in his affidavit, the 90% statistic is a well known opinion of Dr. Stuemky and thus his testimony may have tended to support the testimony of Dr. McKinnon. In addition, while it is not directly stated by Dr. Stuemky, it is clear that he believes this may be one of the 10% cases due to the allegations. It is interesting to note that Dr. Stuemky does not say that there **would be** physical findings in this matter only that it would "seem more likely that there should have been physical findings." Dr. McKinnon was thoroughly cross-examined on this point and concedes in effect the same conclusion: that the number of episodes, with force, without lubrication may have left physical finding and that he found none. The information proffered by Defendant was clearly before the jury without the introduction of additional testimony.

Order dated Nov. 24, 2015, <u>Whitely</u>, No. CF-2006-250, slip op. at 7–8 (emphasis in original). On appeal, the OCCA affirmed because, among other reasons, Petitioner had not shown any prejudice from counsel's omissions.

The federal district court concluded the OCCA's determination was not unreasonable. It stated:

> Dr. Stuemky's affidavit fails to challenge Dr. McKinnon's testimony in any meaningful way and does not establish[] that K.B. would have absolutely had injury. Further, Dr. McKinnon testified that forced anal penetration without lubrication would likely: (1) be painful; (2) cause bleeding; and (3) create a greater chance of injury. <u>See</u> *supra* p. 9. In sum, assuming Dr. Stuemky would have testified as his affidavit is presented, the expert would not have provided any substantive information that the jury did not already hear. Accordingly, the OCCA reasonably applied <u>Strickland's</u> prejudicial prong in finding there was not a reasonable likelihood that the results of Petitioner's trial would have been different had trial counsel investigated so as to call Dr. Stuemky as a witness. <u>See</u> <u>Hanson v. Sherrod</u>, 797 F.3d 810, 832 (10th Cir. 2015) ("We cannot say it was unreasonable for the OCCA to hold that [the cumulative evidence] would not have changed the outcome of Hanson's trial."). And, because the claim would have therefore lacked merit on direct appeal, the OCCA further reasonably applied <u>Strickland</u> in finding no reasonable likelihood that the outcome of the direct appeal would have been

14

different had appellate counsel challenged trial counsel's conduct. See Fairchild v. Trammell, 784 F.3d 702, 715 (10th Cir. 2015) ("To prevail on a claim of ineffective assistance of appellate counsel, a defendant must establish that . . . there is a reasonable probability that, but for this unreasonable failure, the claim would have resulted in relief on direct appeal.").

Whitely v. Farris, No. CIV-16-514-HE, 2018 WL 1733997, at *6 (W.D. Okla. Jan. 10, 2018), report and recommendation adopted, No. CIV-16-514-HE, 2018 WL 1732072 (W.D. Okla. Apr. 10, 2018).

b. Analysis

As a preliminary matter, Petitioner contends that we should review this claim de novo because the state courts unreasonably concluded that the evidence in Dr. Stuemky's affidavit did not prove prejudice. He characterizes his argument as an argument that Dr. Stuemky's affidavit rebuts by clear and convincing evidence the state courts' speculative factual findings that Petitioner's "'different or better experts' were the 'benefit of hindsight.'" He reasons that the affidavit—in light of its statement that the absence of physical evidence and other factors are "of great concern"—indicates that Dr. Stuemky believes the lack of physical evidence substantially undermines K.B.'s credibility.

It is not immediately evident to us that that the state courts made a factual finding, as opposed to a legal determination. But even if they did make a factual finding, Petitioner's argument lacks merit. Although Dr. Stuemky indicated that the absence of physical evidence—among other factors—is "of great concern," it is not clear that Dr. Stuemky believes the lack of physical evidence *alone* substantially

15

undermines K.B.'s credibility.[5]  Resolving this issue in Petitioner's favor would itself require speculation.[6]  Under these circumstances, Petitioner has not rebutted any factual determination by clear and convincing evidence.  We thus decline to review this claim *de novo* on that basis.[7]

Further, we agree with the district court that the OCCA's resolution of this claim was not an unreasonable application of Strickland.  Insofar as he indicated physical evidence of abuse would be more likely under the circumstances presented

---

[5] We note that at trial, defense counsel extensively addressed the other factors Dr. Stuemky identified as difficult to believe and of great concern.

[6] Petitioner also contends that by denying him an evidentiary hearing, the state district court prevented him from resolving the court's "speculative concern."  He does not initially argue for *de novo* review on this basis, nor does he cite any legal authority that would support such relief.

Relatedly, Petitioner also contends that the state district court's failure to hold an evidentiary hearing prevented Petitioner from producing Dr. McKinnon or obtaining his studies to prove the 90 percent statistic was not relevant.  But he once again fails to argue for *de novo* review or cite any legal authority showing he is entitled to any relief.

In the last sentences of the section of his opening brief which addresses Dr. McKinnon's testimony and Dr. Stuemky's affidavit, Petitioner finally argues that "[t]he State court[']s finding of fact and application of established Supreme Court precedent are unreasonable.  28 U.S.C. § 2254(d)(1) and (2)[.]  The Court owes no deference."  But that conclusory assertion still identifies no Supreme Court precedent that the OCCA unreasonably applied.

[7] Petitioner faults the state courts for highlighting that Dr. Stuemky did not say that a doctor would have found physical signs of abuse.  Based on that statement, he contends that the state court required him to make a greater showing of prejudice than Strickland requires.  This argument is not persuasive.  When the state district court made that statement, it was analyzing the content of Dr. McKinnon's testimony and Dr. Stuemky's affidavit to determine whether the evidence was cumulative.  It did not impermissibly require Petitioner to satisfy a heightened burden on his ineffective assistance of counsel claim.

16

in this case, Dr. Stuemky's affidavit is essentially cumulative of Dr. McKinnon's trial testimony. "Generally, counsel's failure to call witnesses whose testimony would be corroborative or cumulative of evidence already presented at trial is not deemed constitutionally deficient." Snow v. Sirmons, 474 F.3d 693, 729 (10th Cir. 2007).

The other statements in Dr. Stuemky's affidavit also add little to Petitioner's case. Dr. Stuemky indicates that K.B.'s story of fighting back "simply does not fit with ongoing child molestation by fathers/stepfathers" and that her "denial of pain does not fit with her allegations of fighting back and that force was used." But at trial, no one contended that K.B.'s testimony about fighting Petitioner was, in fact, true.

Koelling testified that: (1) K.B. was likely describing her ability to fight back "from her perspective"; (2) there is a lot of shame in being a victim and, because of her helplessness, K.B. was "looking for things that she did or she could have done to change the situation"; and (3) "[s]ome of the things [K.B.] told me were difficult for me to comprehend." And in its rebuttal argument, the prosecution argued:

> First one I want to talk about that they want to make a big thing out of is the fighting back and the hiding. [K.B.] tells you that she fought back, and I don't doubt that she wanted to. Don't doubt for a minute that she wanted to fight back and she wanted to punch and she wanted to hit him and kick him, and in her mind, as she's closing her eyes, as she's being raped, she probably is fighting him and she probably is hitting him and she probably is hiding under her bed and she probably is hiding in her closet.

> But what's really going on is the defendant is raping her. She probably fought the first few times, but after that it wasn't worth it. It was gonna happen anyway. He's in her home. He's where she lives. She can't hide from him every day, all day. Maybe should get it over with for that time that day, maybe he won't do it to you that night.

17

> So I bet she did fight some. But a lot of what she says about the fighting is children not wanting to admit that they laid there and allowed that to happen to them over and over and over and over again. So she's hiding. So she's fighting.

In light of this testimony and argument, it is unlikely that the jury that convicted Petitioner did so because it believed that K.B. had routinely fought Petitioner when he attempted to sexually assault her. Thus, a court could reasonably conclude that no reasonable probability existed that this evidence from Dr. Stuemky—which was predicated on K.B.'s testimony about fighting back—would alter the outcome of the trial.

Under these circumstances, the OCCA did not unreasonably deny Petitioner's claim.

### ii. Forensic Interview Expert

Petitioner also argues that trial counsel was ineffective when he presented Dr. Ingraham as his forensic interview expert because: (1) she was not a forensic interview expert; (2) counsel had not gone over Dr. Ingraham's testimony with her; (3) she had not reviewed the Officer Cox interview before trial; and (4) her testimony regarding memory distortion was irrelevant and reduced the significance of K.B.'s inconsistent statements, which weakened Petitioner's argument that K.B. was lying.

Petitioner supports his claims with an affidavit from Dr. Maggie Bruck, Ph.D.[8] In her affidavit, Dr. Bruck states that Officer Cox: (1) "should not have been allowed

---

[8] In addition, Petitioner directs us to an affidavit from his post-conviction investigator that he claims establishes that: (1) Koelling would not have re-

18

to interview K.B."; (2) "used a number of interrogatory techniques used by police to produce confessions from suspects"; and (3) could have caused K.B. to produce a false statement by using those techniques on a child removed from her home who could not contact her mother and missed her. Dr. Bruck also asserts that Dr. Ingraham's suggestibility/memory distortion testimony was irrelevant because K.B.

---

interviewed K.B. if she had been aware of Officer Cox's interview; and (2) Koelling admits K.B. may have fabricated her accusations. But the only reference to this evidence in the federal district court is in Petitioner's Statement of the case. There, he asserts:

> On August 4, 2014, Mr. Whitely filed a motion in the trial court to supplement his post-conviction application with evidence from Tracy Koelling, the state's forensic interviewer who testified at trial. As an offer of proof, Mr. Whitely submitted an affidavit prepared by Private Investigator Frank Gaynor, who interviewed Koelling. (R. 1443-49)

Petition Under 28 U.S.C. 2254 for Writ of Habeas Corpus By a Person in State Custody at 4, Whitely v. Farris, No. CIV-16-514-HE, 2018 WL 1732072 (W.D. Okla. Apr. 10, 2018). He did not, however, identify the evidence in the affidavit or argue its significance. Because Petitioner did not adequately present that evidence to the federal district court, we do not consider it here.

Petitioner also directs the court to the affidavit of Dr. H. D. Kirkpatrick, Ph.D. But, with respect to that affidavit, he merely argues that:

> Post-conviction counsel also obtained an independent, unbiased forensic analysis of K.B.'s statements from Dr. [H. D.] Kirkpatrick. (R 534-63) Kirkpatrick applied a rule-out hypothesis approach and found that K.B.'s statements support conflicting conclusions. (R. 551-52)

He does not argue why it is significant that K.B.'s statements support conflicting conclusions or how he was prejudiced by the absence of the evidence contained therein. Thus, we do not consider it. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

19

had admitted to the abuse in a note that pre-dated her interview with Officer Cox, and that an expert should have instead testified about lies in childhood.

Petitioner also submits the affidavit of Dr. Stuemky. In his affidavit, Dr. Stuemky criticizes Officer Cox's interview with K.B. He indicates that the interview presented a major conflict of interest and a risk of intimidation because Officer Cox had: (1) worked as a police officer in the same police department as K.B.'s parents; and (2) interviewed K.B. late at night without any observers or any videotape.

Lastly, Petitioner identifies portions of Dr. Ingraham's trial testimony where she stated that she was: (1) testifying that Officer Cox was "wrong"; and (2) not opining that K.B. was lying.

### a. Prior Decisions

The state district court rejected this claim for several reasons. First:

> Of the nine (9) points offered by Dr. Stuemky, seven (7) deal with the disclosures made by and interviews of the child rather than the physical examination itself. All seven of those concerns were addressed by defense counsel in the cross-examination of Dr. McKinnon. In addition, defense counsel addressed many of those issues with Linda Ingraham, the expert forensic psychologist called by the defense. Dr. Stuemky also opines that the first interview of the child was appropriate and well done. This information, if testified to, would have further supported State's case and would have contradicted another proffered expert, Dr. Maggie Bruck. In fact, Defendant specifically alleges that bolstering the State's case is problematic when he argues that trial counsel was ineffective by presenting Dr. Ingraham, who also testified that the forensic interviews were appropriately done. Either Dr. Stuemky would be supporting, yet again, the opinion that the interview was appropriate or, if Dr. Bruck had testified, he would be contradicting another defense witness. This would have been detrimental to the defense.

Order dated Nov. 24, 2015, Whitely, No. CF-2006-250, slip op. at 8–9.

20

Second:

Both [Dr. Maggy Bruck and Dr. H. D. Kirkpatrick] are as well qualified in their fields as Dr. Ingraham and espouse alternative theories to present to the jury. Dr. Bruck, primarily puts forth a position of attacking the credibility of the child as opposed to the memory distortion theory espoused by Dr. Ingraham and would present information regarding the invalidity, from her perspective, of the forensic interviews. Dr. Kirkpatrick would present information about confirmatory bias thus attacking the interview techniques. A portion of the opinions were covered in the cross-examinations of Dr. McKinnon, Tracy Koelling (forensic interviewer) and Officer Cox as well as in the direct examination of Dr. Ingraham. Some of the opinions proffered clearly contradict other expert evidence given. However, particularly as it relates to Dr. Bruck, there are valid strategic reasons to proceed with opinions such as that offered at trial. In particular, attacking the credibility of [a] child witness is perilous. A jury may feel more sympathy for the child after the repeated attempts to cast her as a liar. The defense offered two theories for not believing the statements of the child—that the child had fabricated the story and that she had a distorted memory of the events. These are valid defense theories which provided the jury with options. Because a valid strategic reason exists for the manner in which the underlying case proceeded, it cannot be found to be below an objectively reasonable standard. This seems to be exactly the trap that the Strickland court warns against— that hindsight often provides us with many different avenues to traverse. But this Court does not find, based upon the totality of the trial record, that trial counsel's strategic decision to offer the memory distortion theory was unreasonable or fell below the standard required.

Id. at 9–10.

On appeal, the OCCA affirmed. It reasoned that:

[The state district court] thoroughly examined [Petitioner's] claims regarding what seems to be a battle of the experts. A review of trial counsel's affidavit reveals that, in hindsight, counsel feels that he could have handled [Petitioner's] trial differently, and that some of the strategic decisions he made did not work out as intended.

Order Granting Request to Associate Counsel and Affirming Denial of Post-Conviction Relief, Whitely v. Oklahoma, No. PC 2015-1120, slip op. at 8 (Okla. Crim. App. Apr. 22, 2016).

21

The federal district court also rejected this claim. It determined the OCCA's decision was not unreasonable because the evidence that Petitioner advanced was essentially cumulative. It reasoned that, at trial, Dr. Ingraham (1) had extensively criticized Officer Cox's interview techniques; (2) had testified about her concerns regarding the absence of details in K.B.'s allegations and various improbabilities presented therein; (3) had not testified that the anal rape had occurred; and (4) had not testified that K.B. was not lying and instead had taken no position on the truth or falsity of the allegations. It further reasoned that although Dr. Bruck and Dr. Ingraham had presented conflicting opinions regarding Koelling's second interview, the jurors watched the second interview and were able to determine for themselves whether Koelling appeared biased towards disclosure.

### b. Analysis

We agree with the district court's analysis for several reasons. First, the evidence does not show Dr. Ingraham harmed Petitioner's case. Although Dr. Ingraham indicated she was not opining that K.B. was lying, she also never testified that K.B.'s allegations were true.

Further, when she testified that Officer Cox was not "wrong," Dr. Ingraham was opining that his conduct may have been proper from a community safety perspective. She did not testify that his conduct did not undermine the credibility of K.B.'s allegations—in fact, she specifically testified that he was untrained and that his interview was inconsistent with protocols for interviewing child victims of sexual

22

abuse, had "introduced a possible source distortion," and may have distorted K.B.'s memory.

In addition, the evidence of memory distortion is not clearly inapplicable to this case. Although K.B. wrote a note to her friends before her interview with Officer Cox, no expert indicated to the jury[9] that the note (even if a lie) would have prevented Officer Cox from distorting K.B.'s memory at his interview—and K.B.'s post-note allegations are expansive.

And even if Dr. Ingraham's memory distortion testimony was not entirely relevant, we are satisfied that testimony did not materially prejudice Petitioner. That testimony did not clearly undermine Petitioner's argument that K.B.'s inconsistencies showed she was lying. Dr. Ingraham testified that she would expect K.B. to remember pain and bleeding unless she "blocked" the experience. She further testified that K.B. did not, in her opinion, have that type of traumatic amnesia. By opining in that manner, Dr. Ingraham's testimony left ample room for counsel to argue that the inconsistencies in K.B.'s testimony showed she was lying.

Second, Petitioner was not prejudiced in the manner that Strickland requires by the absence of the evidence he now presents. As the district court recounted, both Dr. Ingraham and Koelling testified extensively about the proper techniques for

---

[9] Dr. Bruck's affidavit asserts that memory distortion testimony is appropriate only when questioners suspect wrongdoing and the child was initially silent (unlike here where K.B. wrote the note). But no such limitation was described to the jury.

23

interviewing child victims of sexual abuse, which Officer Cox clearly did not follow. Indeed, Dr. Ingraham specifically criticized Officer Cox's interview.

In addition, Officer Cox testified at trial that he interviewed K.B. at night (at approximately 9:15 p.m.),[10] that Mrs. Whitely and Petitioner worked at the Noble Police Department as dispatchers, and that K.B. had been present there on several occasions. Even in the absence of Dr. Stuemky's testimony on that issue, the jury was well-equipped to evaluate the risk of intimidation or conflict of interest from those circumstances.

The allegations regarding the second Koelling interview also do not establish the prejudice that Strickland requires. True, Dr. Bruck's affidavit indicates that during the second interview, Koelling was merely seeking to elicit as many abuse-consistent details as possible and did not test the hypothesis that K.B. had made up the allegations despite K.B.'s inconsistent allegations. The jury, however, watched a video of the second interview and the jurors were able to: (1) consider the inconsistencies; and (2) observe the extent to which Koelling did or did not challenge K.B. and did or did not explore the hypothesis that no sexual abuse had occurred. Thus, they were able to evaluate the interview themselves.

Lastly, we note that Dr. Bruck did not review K.B. or L.W.'s testimony. Their testimony was significant because K.B. and L.W. testified that K.B. was known to

---

[10] Petitioner posits that Officer Cox may also have been in uniform during the interview. But he directs us to no evidence that was the case. To the extent he asserts that it is a reasonable inference that Officer Cox was in uniform, a jury is just as capable of drawing that inference when considering any pressure on K.B.

24

lie. Because Dr. Bruck did not review this testimony, which is specific to K.B., her affidavit does not clearly indicate that additional expert testimony on childhood lying was necessary.

Thus, because the record supports a determination that Dr. Ingraham did not materially harm Petitioner's case and the evidence Petitioner advances now would not have materially benefitted his case, we are satisfied that the OCCA did not unreasonably apply Strickland.

### iii. Evidence of K.B.'s Dishonesty, Manipulation, and Attention-Seeking

Petitioner next argues that his counsel acted ineffectively by failing to present additional evidence of K.B.'s prior dishonesty, manipulation, and attention-seeking behavior. Petitioner contends counsel should have called impeachment witnesses and witnesses who could testify about K.B.'s reputation, and that the state courts unreasonably concluded the absence of that evidence did not prejudice him.

### a. Prior Decisions

The state district court analyzed this claim as part of a larger claim that "trial counsel was ineffective for failing to present certain witnesses that would possess relevant information that would tend to disprove" K.B.'s allegations. The state district court denied that claim because:

> [t]he Affidavits of Danny Moss, Jeanna Moss, Shirely Orsak, and Toni Snyder are observations of neighbors who had no extensive contact with the Whitelys or the child. The testimony proffered is that they never saw anything that would indicate to them that abuse was occurring. (For example: "I never noticed anything unusual about our neighbors", "They appeared to be a normal family" . . . ). These statements have minimal relevance at best. The Affidavits of Renee Haley, Jack Tracy, and Jack

25

Haley, all rely on hearsay as the basis for their opinions as to the child's character for untruthfulness. Frances Burnett could only testify as to the general character for untruthfulness but had no specific instances. These statements would not have been admissible and therefore it was not error on the part of trial counsel to not sponsor those witnesses. In addition, their observations as to not observing any behavior on the part of the child or the Defendant, like those of the witnesses above, would only have minimal relevance. This is particularly true in light of the fact that the same information was presented by Larry Whitely, Sr. Furthermore, Defense counsel was able to provide specific instances of untruthfulness to the jury through the testimony of [L.W.]. Defense counsel was also able to argue that the victim was a "troubled" and "untruthful" child in his closing argument. Counsel's conduct was not objectively unreasonable.

Order dated Nov. 24, 2015, Whitely, No. CF-2006-250, slip op. at 10–11. The

OCCA affirmed without any additional analysis.

The federal district court held that Petitioner was not entitled to relief because:

Petitioner's attorney elicited testimony from K.B.'s friend that people at school called K.B. a liar, see Tr. Vol. II at 381, and K.B. herself admitted that she had been in trouble for lying. Tr. Partial Proceedings (dated Jan. 24, 2007) at 97. And, while K.B. claimed not to remember the meeting, Petitioner's attorney was able to suggest through his questioning that K.B. had visited with Jack Tracy about her lying. Id. Additionally, trial counsel called Petitioner's father, Larry Whitely, who presented evidence that K.B. could not have hidden in the closet or under the bed as she had suggested. See Tr. Vol. IV at 791-92. Finally, in questioning Dr. Ingraham, Petitioner's attorney elicited evidence that K.B., after making her allegations, "was getting attention" "which is important to a child." Id. at 743. In closing argument, trial counsel used all this information to emphasize K.B.'s alleged dishonesty and the incredibility of her allegations. See Tr. Vol. V at 858, 860-61.

In light of this evidence, and based in large part of the generalness of the proffered testimony, Petitioner simply cannot establish any reasonable probability that the outcome of his trial would have been any different if trial counsel had called these witnesses, or, in the case of Kelly Whitely, asked her different questions. Accordingly, the OCCA reasonably applied Strickland in finding no prejudice in trial counsel's failure to call these witnesses, and subsequently, in appellate counsel's failure to raise this claim on direct appeal.

26

<u>Whitely</u>, 2018 WL 1733997, at *11, <u>report and recommendation adopted,</u> 2018 WL 1732072.

### b. <u>Analysis</u>

The district court did not err by denying relief on this claim.  While Petitioner directs us to additional evidence of K.B.'s dishonesty, that evidence is largely cumulative of the testimony produced at trial and highlighted in trial counsel's closing argument.  In addition, Dr. Ingraham testified that attention is important to children.  Although the evidence that Petitioner now asserts is stronger and more specific to K.B., when we apply our deferential standard of review, the record does not compel a determination that a reasonable probability of a different outcome exists.  Thus, having considered the evidence proffered and presented in this case, we are satisfied that the state courts did not unreasonably apply <u>Strickland</u>.

### B. <u>Prosecutorial Misconduct</u>

Petitioner brings two prosecutorial misconduct claims.  First, he contends that the prosecutor used false testimony to secure his conviction.  Second, he argues that the government improperly coerced Mrs. Whitely.  We address each claim in turn.

### 1.

Petitioner's first prosecutorial misconduct claim is that the Oklahoma state courts unreasonably applied <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), when they resolved his claim that the prosecution relied on false testimony to secure his

conviction. Specifically, he contends that Mrs. Whitely testified falsely when she indicated she was not "here today in support of [Petitioner]."[11]

To establish a Napue violation, a petitioner must show that "(1) [a witness's] testimony was in fact false, (2) the prosecution knew it to be false, and (3) the testimony was material." United States v. Caballero, 277 F.3d 1235, 1243 (10th Cir. 2002).

Petitioner directs us to several items of evidence to support his claim. First, he directs us to his own affidavit, in which he asserts that:

> My wife was present each day at the trial to support me, she had supper with me and she stayed with me two or three nights at the motel I stayed at during the trial. She continuously believed that I was innocent. I know this because she communicated it to me.

Second, Petitioner submits certain records from the Oklahoma Department of Human Services. Those records indicate: (1) during an interview on February 5, 2006, Mrs. Whitely said, in reference to the allegations, "I just can't see it," later "seemed to be leaning toward believing [K.B.] and accepting the possibility that the allegations [were] true," and subsequently stated that her "gut was telling her" the events described in K.B.'s allegations did not occur; (2) on May 31, 2006, a DHS employee and K.B.'s attorney observed Petitioner and Mrs. Whitely hugging and

---

[11] Petitioner also argues that Mrs. Whitely testified falsely when she testified that a divorce action was pending. Significantly, Petitioner first raised the divorce testimony in federal court in his objections to the Magistrate Judge's report and recommendation. "Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996).

kissing each other for eight minutes after a court hearing; (3) on August 25, 2006, when the DHS employee confronted Mrs. Whitely about the May 31, 2006 events, Mrs. Whitely said she believed Petitioner "at that time but now has no doubts that [Petitioner] hurt [K.B.]"; and (4) during an assessment of Mrs. Whitely's home on August 28, 2006, Mrs. Whitely made a comment that led a DHS employee to believe that Mrs. Whitley did not believe Petitioner abused K.B. Those events occurred before the trial in this matter.

Third, Petitioner cites witness testimony at his sentencing, which indicates that Mrs. Whitely did not believe K.B.'s allegations against him.

Petitioner also directs us to the prosecution's closing argument. There, the prosecution argued that the jurors "didn't hear [K.B.'s] mom come in here and you didn't hear her mom say she was a liar. And she would be the one who would know more than anyone."

The Respondent argues, among other things, that the prosecutors did not violate Napue because the "alleged false testimony was about [Mrs. Whitely's] subjective state of mind during the trial" and, as such, "[t]he only person who could ever know whether Mrs. Whitely's answer was true or false [wa]s Mrs. Whitely."

We conclude that this claim lacks merit even if we review it *de novo*.[12] But before we explain why we conclude that the prosecution did not violate Napue, we must

---

[12] Petitioner argues that the state courts did not address this claim and that he is entitled to *de novo* review. We do not resolve that issue because, as we noted above, his claim also fails when we review it *de novo*.

emphasize the limited nature of our holding. In this opinion, we do not determine whether <u>Napue</u> may ever apply to subjective intentions or beliefs. We also do not decide whether the prosecution may violate <u>Napue</u> when a witness's statements regarding their subjective belief or intentions at trial conflict with prior unequivocal statements regarding the witness's beliefs or intentions prior to trial. Our holding here is more modest; we merely hold that where a witness: (1) makes equivocal or contradictory statements regarding her intentions or beliefs prior to trial; (2) then testifies regarding her current subjective intentions or beliefs *at the time of trial* in a manner inconsistent with some of those prior statements and consistent with others; and (3) no other evidence indicates that the prosecution knew the witness's testimony was false, the petitioner has not made a sufficient showing that the prosecution knew the trial testimony was false.

We reach this conclusion for several reasons. First, the subjective nature of this inquiry renders it difficult for the prosecution to determine whether a witness is lying, even if the witness's prior statements are inconsistent with the witness's statement regarding her current beliefs and intentions. And if the witness has made contradictory or equivocal statements in the past, it would be even more difficult for the prosecution to know the truth or falsity of the statement at trial.

Second, under these circumstances, the evidence available to the prosecutor regarding the witness's subjective intentions and beliefs is essentially ambiguous. When presented with ambiguous evidence, the prosecution is entitled to argue the view of that evidence most favorable to it. <u>See</u> <u>United States v. Blueford</u>, 312 F.3d 962, 968 (9th Cir. 2002) ("It is certainly within the bounds of fair advocacy for a prosecutor, like any

30

lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true. But it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt, particularly when it refuses to acknowledge the error afterwards to either the trial court or this court and instead offers far-fetched explanations of its actions."). If we were to hold that, in a case like this, the government must inform the jury that the less favorable view of ambiguous evidence was correct, we would infringe on the prosecution's right to present its case.

Here, Petitioner has not shown that the prosecution knew that Mrs. Whitely's testimony was false. As we previously discussed, Petitioner directs the court to certain evidence to support his claim. But it is clear that the prosecution did not know Mrs. Whitely's *sentencing* testimony during the trial. Petitioner also does not direct us to any evidence that the prosecution was aware of the facts Petitioner asserts in his affidavit. Thus, the only evidence pertinent to the prosecution's knowledge at trial is the evidence contained in the DHS records. That evidence is equivocal and reflects shifting positions by Mrs. Whitely. Based only on that evidence, no reasonable factfinder could conclude that the prosecution knew Mrs. Whitely's testimony was false.

2.

Petitioner also argues that the prosecution, in violation of his due process rights, prevented Mrs. Whitely from testifying that she did not believe K.B.'s allegations by repeatedly informing her that her children would not be returned to her if she supported Petitioner.

31

To establish a violation of his due process rights, Petitioner must "provide evidence that there was actual government misconduct in threatening or intimidating potential witnesses and that such witnesses otherwise would have given testimony both favorable to the defense and material." United States v. Allen, 603 F.3d 1202, 1211 (10th Cir. 2010).

### a. Prior Decisions

The state district court rejected this claim for several reasons:

> In his affidavit, trial counsel states that he did not ask certain questions of [Mrs.] Whitely because he believed her fear of DHS might consume her. This was a valid strategic reason not to ask particular questions-counsel did not know whether [Mrs.] Whitely's testimony would assist his client. Furthermore, the affidavit of Kelly Whitely now proffered is inconsistent with other statements. In particular, that the child always lied and made bad grades. The affidavit offered by the child's teacher indicates that she was her "top student", was not dishonest and was a very moral child. See Affidavit of Julie Curry. This was also indicated by the Affidavit of [M.M.] (offered by the Defendant) when she stated that [K.B.] never lied about big stuff and only told little white lies. In addition, the Affidavit of Michael Baker (offered by the Defendant) calls into question the character and credibility of Kelly Whitely. All of this evidence, offered by the Defendant, tends to cast doubt on the credibility of the statement of Kelly Whitely offered long after she "had nothing left to lose".

> These issues also are relevant to the claim of Prosecutorial Misconduct raised by the Defendant. [Mrs.] Whitely states that she was pressured into not supporting her husband, the defendant, for fear of reprisals from DHS. However, nothing in the record indicates that the statements made by the prosecution or DHS were false nor that anyone indicated to [Mrs.] Whitely that she should make false statements in court. The Court in Roy v. State, 2006 OK CR 4 7, stated that "Relief will be granted on a prosecutorial misconduct claim only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon. In this matter, because the statements of [Mrs.] Whitely are highly susceptible to credibility attacks (as stated above) and that there is no evidence that a legal action on behalf of the

State in removing her children caused her to testify falsely, the claim of prosecutorial misconduct must also fail.

Order dated Nov. 24, 2015, Whitely, No. CF-2006-250, slip op. at 11–12.

The OCCA affirmed. In its opinion, it noted that:

The victim's mother, Kelly Whitely, claimed that she felt pressured into not supporting her husband, Whitely, based on DHS's threats of reprisal. [The state district court] noted there was no supporting evidence in the record for the claims that statements made by the prosecution or DHS were false, nor was there any evidence to support a finding that Kelly Whitely was encouraged to make false statements at trial. The court determined that Kelly Whitely's affidavit offered in support of Whitely's application for post-conviction relief contained statements which were inconsistent with statements made by other witnesses, and are "highly susceptible to credibility attacks". [The state district court] also found that there was no evidence that Kelly Whitely was coerced into giving false testimony at trial based on a threat of legal action to remove her children from her custody. The court found the claim of prosecutorial misconduct did not warrant relief.

Order Granting Request to Associate Counsel and Affirming Denial of Post-Conviction Relief, Whitely, No. PC 2015-1120, slip op. at 5. The OCCA then indicated that it agreed with the lower's court's resolution of the issue. Id. at 6. The OCCA later elaborated that:

[Trial counsel] also confirms that [Petitioner] wanted to testify in his defense, but that he . . . ultimately convinced [Petitioner] not to take the stand. [Trial counsel's] statement regarding Kelly Whitely reads as follows:

16. I realize also that the jury missed some critical information from my client's wife who is also [K.B.'s] . . . mother. Although I had some reasons, at the time, for what I did and did not ask Kelly Whitely, I think it would have had a major impact on the jury if the jury had known that Kelly Whitely did not believe the allegations against my client and that [K.B.] lied on many occasions.

The affidavit clearly indicates, while not being specific, that [trial counsel] had reasons for not asking Kelly Whitely questions which she now indicates

33

in her affidavit she would have been willing to answer. As noted in this Court's prior order, the question to be resolved is whether or not Kelly Whitely refused to answer these questions because she was truly intimidated by D.H.S. and the prosecution or whether at this point, having nothing to lose, she has changed her story. The real question is, had Kelly Whitely testified that she disbelieved the victim and believed her husband, would the results at [Petitioner's] trial have been different.

Although he asserts that Kelly's testimony might have had an impact on the jury, defense counsel . . . states that he had an unspecified reason for limiting his questioning of Kelly Whitely. We cannot find this strategic behavior to be objectively unreasonable. Additionally, as noted by [the state district court], several of the affidavits offered by [Petitioner] in his post-conviction application call into question Kelly Whitely's credibility and her character for truthfulness. The post-conviction claim is that Kelly was faced with a difficult choice when appearing at [Petitioner's] trial. We do not disagree. However, after the trial and prior to knowing that D.H.S. would not be returning her children to her custody, Kelly wrote a letter to the district court prior to [Petitioner's] sentencing advising the court that she did not believe [Petitioner] committed the offenses and expressing her belief that [K.B.] was lying. It is difficult to reconcile Kelly Whitely's claim that she was too intimidated to testify at trial because she feared losing her children but she was not afraid of losing them when she chose to write a letter on [Petitioner's] behalf prior to sentencing.

Id. at 8–9.

The federal magistrate judge recommended that the district court deny relief on this claim. The magistrate judge's report and recommendation reasoned that:

First, as noted above, Petitioner must initially show that the State actually and substantially interfered with Mrs. Whitely's decision to testify. See supra p. 26, 123 S. Ct. 357. But Mrs. Whitely did in fact testify, and as a defense witness. See Tr. Vol. IV at 819-26. According to Mrs. Whitely's testimony, she regularly checked K.B.'s undergarments for blood, believing K.B. would soon begin menstruating, and never found any. Id. at 820-21. Moreover, Petitioner claims that had trial counsel asked her at trial, Mrs. Whitely "would have testified" about K.B.'s lying. Pet. at 52-53. Finally, as the OCCA noted, Mrs. Whitely wrote a letter to the district court, approximately one-month after trial, claiming that she did not believe K.B. and asking the court to overturn the verdict. Or. at 158 (filed stamped Feb. 22, 2007). Then, in March 2007, Mrs. Whitely testified at Petitioner's

34

sentencing and after *repeated* cautions from the district court that her statements could be used against her in the DHS case, Mrs. Whitely said she was "going to stand by my letter." Tr. of Partial Proceedings (dated March 29, 2007) at 4-6, 10-11, 13-17. The OCCA found, essentially, that this evidence showed a lack of substantial coercion and this Court presumes that factual finding to be correct. See, e.g., Johnson v. Zavaras, 141 F.3d 1184, 1998 WL 141968, at *1 (10th Cir. Mar. 30, 1998) (unpublished op.) (holding, in the context of a confession, "an underlying factual determination that the police did not engage in coercive conduct is presumed correct"). Petitioner has not provided clear and convincing evidence to overcome that presumption of correctness.

Second, Petitioner must show that Mrs. Whitely's testimony would have been material and favorable to his defense, and not merely cumulative to other witnesses' testimony. See supra p. 26, 123 S. Ct. 357. As discussed above, trial counsel elicited testimony regarding K.B.'s alleged dishonesty, and while certainly her mother could have given "favorable testimony," this is insufficient to show prosecutorial misconduct through coercion of a witness. Id. Petitioner has failed to demonstrate that his specific right to put forth a defense was so prejudiced as to be a denial of that right, and therefore, the OCCA's rejection of Petitioner's prosecutorial misconduct claim on this issue was a reasonable application of federal law.

Whitely, 2018 WL 1733997, at *13–14, report and recommendation adopted, 2018 WL

1732072 (emphasis in original).

The district court adopted the report and recommendation. In its order, it stated:

Of the various matters relied on by petitioner here, the evidence as to DHS's dealings with Mrs. Whitely is the most troubling to this court. However, the OCCA accurately noted that Mrs. Whitely testified in her husband's favor at the later sentencing hearing despite the same pressures being potentially present, and there is therefore a plausible basis for the OCCA's conclusion that that appellate counsel was not constitutionally ineffective for not raising that issue on appeal. While this court might not have reached that conclusion if making the determination in the first instance, that is not the nature of the court's determination here. Rather, the question is whether the OCCA's resolution of the issue was unreasonable under the deferential AEDPA standard, and it was not.

Whitely, 2018 WL 1732072, at *2 (footnotes omitted).

35

b.  Analysis

Petitioner argues that the OCCA's determination is an unreasonable application of

Webb v. Texas, 409 U.S. 95 (1972).[13]  In that case, the Supreme Court determined that

the government violated a defendant's due process rights when a defense witness refused

to testify due to improper government interference.  Id. at 95–98.  By contrast, Mrs.

Whitely never refused to testify.  In fact, as we previously noted, she provided some

exculpatory testimony when questioned by defense counsel.

Petitioner nevertheless asserts that Webb establishes that the government violated

his due process rights when, allegedly due to government pressure on Mrs. Whitely,

(1) defense counsel decided not to ask her certain questions because he was unsure

whether Mrs. Whitely would answer truthfully, and (2) Mrs. Whitely did, in fact, answer

certain questions untruthfully.

When determining whether a state court holding violates clearly established

federal law, as determined by the Supreme Court, we narrowly construe the Supreme

Court's holdings.  See Fairchild I, 784 F.3d at 710.  For that reason, the first issue—

whether defense counsel's response to government pressure on Mrs. Whitely rendered the

governmental pressure a violation of due process—is a legal principle that falls outside

the reach of Webb.  Nothing in Webb indicates that Petitioner may assert a due process

---

[13] Petitioner also contends that the OCCA's decision is incompatible with Lynumn v. Illinois, 372 U.S. 528 (1963).  That case only addresses whether the government's conduct was coercive.  Because we determine that Petitioner is not entitled to relief even if we determine the government's conduct was coercive, we need not determine if the OCCA's decision contravenes Lynumn.

36

claim because his trial counsel refrained from asking a witness certain questions rather than asking the questions and seeking relief, if necessary, based on the witness's responses. Because Webb does not authorize such a claim, Petitioner has not shown that the state courts unreasonably applied clearly established federal law with respect to the testimony that Mrs. Whitely claims she would have provided in response to questioning from counsel.

The second issue—whether clearly-established federal law provides that a defendant's due process rights are violated when government pressure results in false testimony—presents a more difficult question. But we need not resolve that question here because we conclude that any error was harmless.

In the § 2254 context, we generally may only grant habeas relief if, after applying de novo review, we determine that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). That harmless error standard requires a greater showing of prejudice than the standard that state courts apply on direct appeal. See id.

We have not previously addressed whether Brecht applies to Webb claims. But a number of other circuits apply harmless error analysis to such claims. See, e.g., Earp v. Davis, 881 F.3d 1135, 1145 (9th Cir. 2018); United States v. Foster, 128 F.3d 949, 953 (6th Cir. 1997); United States v. Saunders, 943 F.2d 388, 392 (4th Cir. 1991); United States v. Pinto, 850 F.2d 927, 932–33 (2d Cir. 1988); United States v. Weddell, 800 F.2d 1404, 1411 (5th Cir. 1986), opinion amended on denial of reh'g, 804 F.2d 1343 (5th Cir.

37

1986); <u>Peeler v. Wyrick</u>, 734 F.2d 378, 381–82 (8th Cir. 1984).  Moreover, we apply

<u>Brecht</u> to <u>Napue</u> claims.  See <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1062 n.13 (10th Cir.

2001).  And we see no meaningful basis for applying <u>Brecht</u> to <u>Napue</u> claims in the

§ 2254 context but not to <u>Webb</u> claims in that context.  Thus, we apply <u>Brecht</u> to this

claim.[14]

---

[14] In <u>Brecht</u>, the Supreme Court noted that its decision did not

> foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.

<u>Brecht</u>, 507 U.S. at 638 n.9.  We consider the application of this exception *sua sponte* because we raise the <u>Brecht</u> standard *sua sponte*.

Significantly, we have never held that a habeas case presented such an error. Indeed, in <u>Duckett v. Mullin</u>, 306 F.3d 982 (10th Cir. 2002), we held this exception did not apply when: (1) a prosecutor "had made improper remarks such as, in arguing for the death sentence, asking the jury whether it would serve 'justice [to] send this man down to prison, let him have clean sheets to sleep on every night, three good meals a day, visits by his friends and family, while [the victim] lies cold in his grave?'"; (2) the prosecutor "'ha[d] been chastised for participating in the same type of improper argumentation in other cases'"; (3) "'our past experiences with this prosecutor le[ft] us convinced that his inappropriate commentary at trial was intentional and calculated'"; and (4) we noted both that "the prosecutor's 'persistent misconduct . . . has without doubt harmed the reputation of Oklahoma's criminal justice system and left the unenviable legacy of an indelibly tarnished legal career'" and that "[o]ur nation's confidence in the fair and just administration of the death penalty is disserved by prosecutors who cynically test the bounds of the harmless-error doctrine." <u>Underwood v. Royal</u>, 894 F.3d 1154, 1176–77 (10th Cir. 2018) (alterations and ellipsis in original) (quoting <u>Duckett</u>, 306 F.3d at 992–94).  We nevertheless concluded that the prosecutorial misconduct did not so infect the integrity of the proceeding that the entire trial was unfair.  <u>Duckett</u>, 306 F.3d at 995.

We are satisfied that this case also does not present such an error for two reasons.  First, as we determined above, no reasonable factfinder could conclude the prosecution knew Mrs. Whitely's testimony was false.  Second, although we do not decide whether the government's interaction with Mrs. Whitely constituted coercion,

The statement at issue here—that Mrs. Whitely was not at the trial to support her husband—was ambiguous. While that statement could lead a jury to conclude that she believed the allegations against Petitioner, the statement does not compel such a conclusion.[15] Further, K.B. testified at trial that: (1) she and her mother had talked about whether her mother believed the allegations and, when asked whether she thought her mother believed her, said "No, not really"; and (2) she did not want to live with her mother, and one of her main problems she had with her mother was that her mother did not believe her.

Mrs. Whitely also provided exculpatory evidence for Petitioner. For example, she testified that she had never seen "any blood or anything like that in [K.B.'s] underwear or on her clothes," and that she was looking for blood because she had expected K.B. to start menstruating. Mrs. Whitely did not testify that she was aware of any facts that indicated the allegations were true.

The prosecution argued that the jurors "didn't hear [K.B.'s] mom come in here and you didn't hear her mom say she was a liar. And she would be the one who would know more than anyone else." That argument was arguably inappropriate because neither the defense nor the prosecution had asked Mrs. Whitely whether K.B. was a liar. But, at the same time, we are not convinced that any prejudice from that

---

even if it did, that conduct was not especially egregious in light of the parallel child placement proceedings.

[15] Indeed, the same is true of Mrs. Whitely's testimony that a divorce was pending between her and the Petitioner.

argument resulted from Mrs. Whitely's testimony that she was not at the trial to support Petitioner.

Under these circumstances, we conclude that Mrs. Whitely's testimony that she was not at the trial to support Petitioner—even if that testimony was false—had no substantial or injurious effect or influence on the jury's verdict. That testimony was therefore harmless.

IV.

For the reasons stated above, we AFFIRM the district court's denial of federal habeas relief under 28 U.S.C. § 2254.

Entered for the Court

Joel M. Carson III
Circuit Judge